248 P.3d 537 (2011)
159 Wash.App. 410
STATE of Washington, Respondent,
v.
Timothy J. BLUEHORSE, Appellant.
No. 38328-4-II.
Court of Appeals of Washington, Division 2.
January 19, 2011.
*539 Ephraim William Benjamin, Attorney at Law, Tacoma, WA, for Appellant.
Kathleen Proctor, Pierce County Prosecuting Atty. Ofc., Tacoma, WA, for Respondent.
VAN DEREN, J.
¶ 1 Timothy Bluehorse appeals his conviction for drive-by shooting and his exceptional sentence based on a gang aggravator.[1] Bluehorse contends that (1) the trial court erred in failing to enter written findings of fact and conclusions of law supporting his exceptional sentence, (2) the record does not support the jury's finding of a gang aggravator, (3) the trial court's reasons for imposing an exceptional sentence were not substantial and compelling because they violated the real facts doctrine,[2] and (4) the exceptional sentence was clearly excessive. In his statement of additional grounds for review (SAG),[3] he challenges his conviction, raising arguments based on his public trial right, the real facts doctrine, vindictive prosecution, and cumulative error.
¶ 2 We affirm his conviction but we reverse the jury's finding of a gang aggravator due to insufficient evidence and, because the trial court's basis for imposing an exceptional sentence violated the real facts doctrine, we vacate Bluehorse's exceptional sentence and remand for resentencing within the standard range.

FACTS
¶ 3 The Outlaw Crip Killers (OLCK) is a street gang that is an offshoot of the larger Bloods gang.[4] At some unspecified time, the OLCKs came into a territorial conflict with a Crips affiliated gang, the Native Gangster Crips (NGC).
¶ 4 Fomai Leoso and his brother, Francis Leoso,[5] were OLCK members. On July 4, 2007, Fomai had a barbeque in his front yard. A number of family members were present, including their cousin Ibbha Pritchard and several children. Shortly after midnight[6] Fomai was outside at the barbeque grill when an unidentified bystander yelled, "`Duck, loc.'"[7] 10 Report of Proceedings (RP) at 1267. A person then screamed, "`[D]rive-by.'" 10 RP at 1267.
¶ 5 At that point, someone opened fire from a dark blue Chevrolet Suburban sports utility vehicle passing in front of Fomai's house. One of the bullets struck Pritchard in the leg. Fomai, who had seen the vehicle before, recognized it as an NGC vehicle; however, he could not see the occupants. He did see that on one of the shooter's hands there was a "plastic thing," similar to a cast, as if the hand had been injured. 10 RP at 1269.
*540 ¶ 6 Pritchard testified that he saw the vehicle's occupant who was shooting but he did not recognize him. He also testified that, before the shooting began, the Suburban pulled up behind them and "someone yelled out something." 9 RP at 1219. He stated, "I think they said something like, `What's up Fuzz?' Or `What's up, cuz?' Or something like that." 9 RP at 1222. He testified that, "What's up, cuz?" is a Crip-related term. 9 RP at 1222.
¶ 7 On or about July 7, 2007, Pritchard and his family were at a lake and "r[a]n into" Francis and Fomai, who also were with family members. 9 RP at 1230. While Francis, Fomai, and Pritchard sat together, Pritchard saw Bluehorse with a group of people and recognized him as the shooter from the July 5 drive-by shooting. Francis, Fomai, Pritchard, and others confronted Bluehorse. Pritchard punched Bluehorse and a fight broke out between Pritchard and his two cousins and Bluehorse and his brother. They exchanged a few punches and then Bluehorse and his brother fled. During this incident, Francis and Fomai observed a "plastic medical-type cast" similar to the one that Fomai had observed July 5 on the shooter's hand.[8] 10 RP at 1293.
¶ 8 On August 23, 2007, the State charged Bluehorse with one count of drive-by shooting with a gang aggravator (count I) in connection with the July 5, 2007 shooting and a second count of drive-by shooting with a gang aggravator (count II) for a shooting involving the Leoso brothers on August 15.[9] The information charged Bluehorse with shooting Fomai in the July 5 incident, rather than Pritchard. The State later filed a corrected second amended information as to the victim in count I, changing the victim's name from Fomai to Pritchard.
¶ 9 At trial, Tacoma Police Detective Bair testified that gang members maintain their status by retaliating when rival gang members assault fellow gang members or encroach on their own gang's territory. According to Bair, a gang member showing disrespect to a rival gang by entering that gang's territory or throwing gang signs at that gang's members might provoke retaliation from the rival gang. Finally, he testified that gang members often display bandannas in their gang's color when committing violent crimes.
¶ 10 According to Francis, from August 2006 until January 2007, each time Francis saw Bluehorse, Bluehorse was wearing all blue clothing and making gang signs with his fingers that identified him as an NGC member or associate.[10] Francis would respond with gang signs identifying his OLCK membership. Francis testified that neither he nor the OLCKs retaliated against Bluehorse for these encounters. Francis did not specify whether these encounters took place in gang-claimed territory, although some of them took place as Bluehorse walked past the Leosos' house.
¶ 11 During closing arguments, the prosecutor began by stating that "this case [i.e., *541 the consolidated case charging Bluehorse and Abuan with the July 5 and August 15 drive-by shootings] involves retaliation, back and forth shootings, gangs having motives to shoot at other gang members and affiliates and then retaliate." 16 RP at 39. The prosecutor spoke only briefly about the July 5 drive-by shooting. He discussed evidence showing that Bluehorse was identified as the shooter. The prosecutor also recounted Francis's generalized testimony about seeing Bluehorse in the past wearing blue and making gang signs. He referred to Bair's generalized testimony about gangs and gang members, stating that
"[w]hen ... there's a shooting like this, they're walking the walk, they're doing the deeds. They're maintaining their status in the gang. They are active and maintaining that status by ... doing what some gang members do, which is retaliate and shoot at and hit sometimes other people with firearms."
16 RP at 44-45. Referring to both the July 5 and August 15 shootings, the prosecutor stated:
Bluehorse [wa]s the only one in this neighborhood that the Leoso[ ]s [we]re concerned about having a motive ... [b]ut remember, ... specific acts by specific people is what retaliation is all about.... "If I see somebody being a gang member of the opposite gang, I've got to do something." That's not it. It is disrespect. Silly things. Flashing a gang sign, you know, like kindergarten, calling somebody a name, that kind of thing.
16 RP at 5.4-55.
¶ 12 Following a trial recess, the court and the parties became aware that two jurors had overheard a conversation related to the case. Specifically, juror number five heard a female in the elevator calling someone, asking "where Hoke was, that he needed to get down [to the court], that it didn't look good."[11] 10 RP at 1331. Juror number nine overheard juror number five when she informed the trial court's judicial assistant of this event. Bluehorse's counsel moved for a mistrial. The parties agreed to question jurors five and nine outside the rest of the jurors' presence. The trial court asked both jurors if they understood what they overheard was not evidence in the case, to which they both replied affirmatively. The trial court instructed both jurors to disregard what they overheard, instructed them not to mention what they overheard to other jurors, and instructed them not to use what they overheard in any way when evaluating the case. The trial court also asked both jurors if they were able to follow these instructions, to which they replied that they could. Bluehorse's counsel unsuccessfully renewed his motion for mistrial.
¶ 13 The jury convicted Bluehorse of the July 5 drive-by shooting, but it acquitted him of the August 15 drive-by shooting and other counts not relevant here. The jury also found that Bluehorse had committed the drive-by shooting in order to maintain or advance his position in a gang.
¶ 14 The trial court determined that Bluehorse's offender score was zero. The standard range sentence based on an offender score of zero for the drive-by conviction was 15 to 20 months. During the sentencing hearing, the prosecutor stated that the State had "grossly undercharged" Bluehorse in count I, the July 5 drive-by shooting. 15 RP (Sept. 12, 2008)[12] at 1806. He stated that his failure to rearraign Bluehorse and charge him with assault in the second degree,[13] resulted "in large part" from his "overwhelming caseload" of gang cases and the complexity of such cases. 15 RP (Sept. 12, 2008) at 1806. He reminded the court that, in count I, the jury had convicted Bluehorse of shooting Pritchard in the leg and stated, "That is more serious than a simple drive-by." 15 RP *542 (Sept. 12, 2008) at 1807. The prosecutor argued that "the ultimate conviction in this case doesn't represent what happened." 15 RP (Sept. 12, 2008) at 1807-08. He then discussed the gang aggravator aspect of the cases, highlighting the injury to Pritchard, the potential harm to bystanders at the Leoso residence on July 5, 2007, and the effect of gang activity on neighborhoods. The prosecutor requested that the trial court impose the statutory maximum sentence for a class B felony, 120 months. RCW 9A.20.021(1)(b).
¶ 15 The trial court stated that the jury's finding that Bluehorse committed the drive-by shooting to advance or maintain his status in a gang was an aggravating circumstance supporting an exceptional sentence. The court went on to state:
One of the things I thought was interesting that [the prosecutor] pointed out was, this could have as easily been charged as an Assault in the First Degree since the personon the occasion of the drive-by on which he wasMr. Bluehorse was convicted by the jury was the occasion in which Ibbha Pritchard was shot in the leg. [The prosecutor] is kind of beating himself up a little bit for not charging that. With an offender score of zero, an Assault in the First Degree has a standard range of 93 to 120 months.[[14]] You can see the difference between that and the 15 to 20 just for drive-by shooting would otherwise have for the same offender score.
. . . .
I do think that [the prosecutor] has made the point that this particular offense resembles much more an Assault in the First Degree than merely the drive-by given that someone was instead shot.
15 RP (Sept. 12, 2008) at 1821-22.
¶ 16 With respect to the gang aggravator, the trial court noted the danger posed to the community in general by cycles of gang violence and the danger posed to the July 5 bystanders in particular. Specifically, the trial court stated:
[O]ne of the things that makes gang activity an aggravating circumstance is because these kinds of reprisals and people firing back ... are the kind of consequence that puts everybody at risk ... [w]hether it is the Leosos firing back at whoever fires at them or them being fired at in this whole sequence of events, this whole neighborhood was, for months, terrorized. It appears Mr. Bluehorse was at least a portion of that.
15 RP (Sept. 12, 2008) at 1823-24. The trial court observed that a 108 month sentence is the midpoint of a "93 to 123" month range for first degree assault with an offender score of zero, again noted the danger to bystanders during the July 5 shooting, and imposed a sentence of 108 months as "a reasonable sentence for Mr. Bluehorse."[15] 15 RP (Sept. 12, 2008) at 1824. But the trial court did not enter written findings of fact and conclusions of law supporting the exceptional sentence. The trial court specified that Bluehorse's sentence should not exceed 108 months in custody and 120 months total time, including community custody.
¶ 17 Bluehorse appeals.

ANALYSIS
¶ 18 Bluehorse argues that the trial court erred when it failed to enter written findings of fact and conclusions of law supporting its imposition of an exceptional sentence. The State concedes this error, but it counters that remand for entry of findings of fact and conclusions of law is unnecessary because the jury found the gang aggravator in a special verdict form and that the trial court's conclusion based on the jury's finding is implicit in the record. Bluehorse also argues that his exceptional sentence is not warranted because substantial evidences does not support the jury's finding of the gang aggravator and that the sentence was clearly excessive and violated the real facts doctrine.

*543 I. LACK OF FINDINGS OF FACT AND CONCLUSIONS OF LAW
¶ 19 Former RCW 9.94A.535 (2005) required that "[w]henever a sentence outside the standard sentence range is imposed, the court shall set forth the reasons for its decision in written findings of fact and conclusions of law." This requirement is mandatory. State v. Hale, 146 Wash.App. 299, 306, 189 P.3d 829 (2008). But we have recognized in the CrR 3.5 context that, where "the trial court's oral opinion and the hearing record are sufficiently comprehensive and clear that written facts would be a mere formality," the trial court's failure to enter mandatory written findings and conclusions is harmless. State v. Hickman, 157 Wash.App. 767, 771 n. 2, 238 P.3d 1240 (2010). Here, the trial court's oral ruling was sufficiently clear to facilitate effective appellate review because it stated that the jury's finding of the gang aggravator supported imposition of an exceptional sentence. Therefore, we do not remand for entry of written findings and conclusions.

II. EXCEPTIONAL SENTENCE
¶ 20 Bluehorse next contends that the trial court erred in imposing an exceptional sentence because the evidence does not support the jury's gang aggravator finding, the trial court's reasons for imposing the exceptional sentence violated the real facts doctrine, and the exceptional sentence was clearly excessive.

A. Gang Aggravator Finding
¶ 21 Bluehorse contends that the trial court erred in imposing an exceptional sentence because the evidence does not support the jury's special verdict that he committed the July 5 shooting to advance or maintain his status in a gang. We agree.
¶ 22 We review the jury's findings of aggravating factors under the clearly erroneous standard. Hale, 146 Wash.App. at 307, 189 P.3d 829. In applying the "clearly erroneous" standard in reviewing the fact finder's reasons for imposing an exceptional sentence, we reverse the findings only if substantial evidence does not support them. State v. Jeannotte, 133 Wash.2d 847, 856, 947 P.2d 1192 (1997). "Substantial evidence" is defined as "`evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premises.'" Jeannotte, 133 Wash.2d at 856, 947 P.2d 1192 (internal quotation marks omitted) (quoting Olmstead v. Dep't of Health, Med. Section, 61 Wash.App. 888, 893, 812 P.2d 527 (1991)).
¶ 23 But we must first determine the nature of the aggravating factor jury finding required by the exceptional sentencing statutes. We review questions of statutory interpretation de novo. State v. Jacobs, 154 Wash.2d 596, 600, 115 P.3d 281 (2005). When interpreting a statute, we seek to ascertain the legislature's intent. Jacobs, 154 Wash.2d at 600, 115 P.3d 281. Where a statute's meaning is plain on its face, we must give effect to that meaning as expressing the legislature's intent. Jacobs, 154 Wash.2d at 600, 115 P.3d 281. We determine the statute's plain meaning from the ordinary meaning of its language, as well as from the statute's general context, related provisions, and the statutory scheme as a whole. Jacobs, 154 Wash.2d at 600, 115 P.3d 281.
¶ 24 Before July 24, 2005, the Sentencing Reform Act of 1981, chapter 9.94A RCW provided an illustrative, nonexclusive list of statutory "[a]ggravating [c]ircumstances" that could form the basis of an exceptional sentence; thus, trial courts could impose an exceptional sentence based on a finding of aggravating factors not listed in the statute. Compare former RCW 9.94A.535 (2004), with former RCW 9.94A.535 (LAWS OF 2005, ch. 68, §§ 3, 7).
¶ 25 For example, in State v. Johnson, 124 Wash.2d 57, 64-66, 73, 873 P.2d 514 (1994), the trial court imposed an exceptional sentence based on its conclusion that the shooting for which Johnson was convicted was based on "`gang motivation'" and because of the "`community impact'" of his crimes, aggravating factors not listed in the nonexclusive aggravating factors statute[16] in effect at the time Johnson committed the shooting. On review, the Washington Supreme Court *544 observed that the evidence before the trier of fact showed that a shooting occurred immediately after members of one gang saw several rival gang members on their territory, that all the individuals involved "`flashed'" gang signs at each other, and that one gang member ran away and shortly reappeared with Johnson, who had a firearm. Johnson, 124 Wash.2d at 70, 873 P.2d 514. Our Supreme Court concluded that the weight of the evidence supported the trial court's conclusion that the shooting was "`gang motivated'" and affirmed the exceptional sentence. Johnson, 124 Wash.2d at 70, 78-79, 873 P.2d 514. Our Supreme Court also concluded that "community impact" was a circumstance justifying the exceptional sentence. Johnson, 124 Wash.2d at 75-76, 873 P.2d 514.
¶ 26 Similarly, in State v. Smith, 64 Wash. App. 620, 622-23, 825 P.2d 741 (1992), the trial court imposed an exceptional sentence on Smith's first degree murder conviction based on the nonstatutory aggravating factor that the murder "was in furtherance of a criminal enterprise," namely a street gang.[17] On appeal, Smith argued that the trial court's conclusion did not support imposition of an exceptional sentence because his gang membership did not relate to the crime. Smith, 64 Wash.App. at 624, 825 P.2d 741. We disagreed, holding that the trial court's findings that Smith specifically went out on a "`mission'" to commit a drive-by shooting against rival gang members and perceived a "`wave'" from one of the victims as a rival gang sign, showed evidence of gang membership and the commission of a crime and connected the murder to the aggravating factor of "furtherance of a criminal enterprise," thus justifying imposition of an exceptional sentence. Smith, 64 Wash.App. at 623, 624-25, 825 P.2d 741.
¶ 27 In 2005, the legislature amended RCW 9.94A.535 in response to the United States Supreme Court's decision in Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). LAWS OF 2005, ch. 68, § 1. As part of these amendments, the legislature enacted RCW 9.94A.535(3)(s), which provides that the trial court may impose an exceptional sentence if the jury finds beyond a reasonable doubt that "[t]he defendant committed the offense to obtain or maintain his or her membership or to advance his or her position in the hierarchy of an organization, association, or identifiable group." Former RCW 9.94A.535(3); LAWS OF 2005, ch. 68, § 3. Unlike the previous version of the aggravating factors statute, the enumerated aggravating factors justifying an exceptional sentence are "exclusive," not merely illustrative. LAWS OF 2005, ch. 68, § 3(3)(s). When challenged, we must determine whether substantial evidence supports the jury's finding that the defendant committed the crime "to obtain or maintain his or her membership or to advance his or her position" in a gang. RCW 9.94A.535(3)(s). Thus, unlike the generalized "gang motivation" or "furtherance of a criminal enterprise" aggravating factors relied on in Johnson and Smith, the amended statute's plain language defines the gang-related aggravating factor the State must prove under RCW 9.94A.535(3)(s).
¶ 28 For example, in State v. Yarbrough, 151 Wash.App. 66, 96-97, 210 P.3d 1029 (2009), the trial court imposed an exceptional sentence under RCW 9.94A.535(3)(s). At trial, the State presented evidence that, four days before Yarbrough shot the victim, Yarbrough and a group of his friends confronted the victim and a group of his friends. Yarbrough, 151 Wash.App. at 75, 210 P.3d 1029. Someone from Yarbrough's group shouted, "`This is Hilltop [Crips],'" and someone from the victim's group responded by shouting a rival gang's name. Yarbrough, 151 Wash. App. at 75, 210 P.3d 1029. Someone from Yarbrough's group then indicated that he would have opened fire on the victim's group if police had not been nearby. Yarbrough, 151 Wash.App. at 75, 210 P.3d 1029. Furthermore, a witness to the shootings testified that Yarbrough uttered, "This is Hilltop Crip, cuz, what you know about that," before *545 shooting the victim. Yarbrough, 151 Wash. App. at 75-76, 210 P.3d 1029. The State's gang expert testified that "the statement, `[W]hat's up, cuz' said to a rival gang member is a sign of disrespect because `cuz' is a term that Crips use to refer to one another" and that "a Crips member frequently utters this phrase just before shooting at a Blood." Yarbrough, 151 Wash.App. at 80, 210 P.3d 1029. Finally, the gang expert testified that gang members could advance or maintain their gang membership by shooting at rival gang members, and that gang members were expected to maintain their status by not allowing a show of disrespect by a rival gang. Yarbrough, 151 Wash.App. at 79-80, 210 P.3d 1029.
¶ 29 On review, Yarbrough conceded that he was a Crips gang member, but he argued that the evidence did not support the trial court's imposition of an exceptional sentence based on the gang aggravator. Yarbrough, 151 Wash.App. at 96, 210 P.3d 1029. We disagreed, based on the State's presentation of evidence that: (1) Yarbrough was a Crips gang member; (2) Yarbrough perceived the victim as a member of a rival gang; (3) the two gangs had had a previous confrontation four days earlier, during which a Crip threatened to open fire on the rival gang; and (4) Yarbrough shot the victim after uttering, "This is Hilltop Crip, cuz, what you know about that," an insulting challenge and warning to the rival gang that gunfire might soon erupt. Yarbrough, 151 Wash.App. at 97, 210 P.3d 1029. We held that the jury could infer from this evidence that Yarbrough committed the crime to advance or maintain his position in his gang. Yarbrough, 151 Wash. App. at 97, 210 P.3d 1029.
¶ 30 Similarly, in State v. Monschke, 133 Wash.App. 313, 321, 135 P.3d 966 (2006), the State charged Monschke with premeditated first degree murder under RCW 9A.32.030 and also alleged that the murder was aggravated under RCW 10.95.020(6). RCW 10.95.020(6) allows the State to prove that "[t]he person committed the murder to obtain or maintain his or her membership or to advance his or her position in the hierarchy of an organization, association, or identifiable group" as an aggravating factor.[18] The jury found Monschke guilty as charged and returned a special verdict finding that he committed the murder to advance his position within a white supremacist organization. Monschke, 133 Wash.App. at 328-29, 135 P.3d 966. Monschke appealed, contending that the evidence did not support the finding that he committed the murder to advance his position as a white supremacist. Monschke, 133 Wash.App. at 333, 135 P.3d 966. We disagreed, based on the State's evidence that: (1) Monschke was a member of a violent white supremacist group; (2) he had often stated his desire to advance his position within the group and to open a local chapter; (3) violent acts advanced a member's status in many white supremacist groups; (4) he sought to advance a companion's status in the group through violent acts; (5) he wore clothing specifically indicating his own previous advancement in the group through violent acts; (6) witnesses testified that, shortly before the murder, Monschke or one of his companions stated that they planned on "`doing' someone `inferior'"; (7) Monschke and his accomplices perceived the victim as inferior; (8) the victim's murder advanced the status of one of Monschke's accomplices; and (9) Monschke wondered aloud whether the murder elevated his status with God. Monschke, 133 Wash.App. at 333-34, 135 P.3d 966. We held that the evidence supported the jury's finding that Monschke committed the murder to advance his position as a white supremacist. Monschke, 133 Wash. App. at 334, 135 P.3d 966.
¶ 31 As in Yarbrough and Monschke, RCW 9.94A.535(3)(s) requires the State to prove beyond a reasonable doubt that Bluehorse's involvement in the drive-by shooting was based on his desire to obtain or maintain gang membership or to advance his gang status. Gang membership alone is not a factor that justifies an exceptional sentence. RCW 9.94A.535(3)(s); State v. Riley, 69 Wash.App. 349, 354, 848 P.2d 1288 (1993).
*546 ¶ 32 Here, Fomai and Pritchard identified Bluehorse as one of the occupants of the vehicle, perhaps the shooter, and they associated the vehicle and Bluehorse with the NGCs. Francis also testified about a territorial conflict between the OLCKs and NGCs in general. An unidentified bystander at the July 5 shooting uttered a phrase containing the Crip word "loc" before the shooting began. Finally, Bair and Frisbee testified generally about gang culture and that individuals may commit a retaliatory shooting against rival gang members to obtain, maintain, or advance their own gang membership or status.
¶ 33 During closing argument, the prosecutor encouraged the jury to rely on Bair's generalized characterization of gang motivation behind drive-by shootings to find the gang aggravator and directed the jury to recall Bair's testimony that "when ... there's a shooting like this, [gang members are] walking the walk, they're doing the deeds. They're maintaining their status in the gang. They are active and maintaining that status by ... doing what some gang members do, which is retaliate and shoot at and hit sometimes other people with firearms." 16 RP at 44-45.
¶ 34 But our Supreme Court has disapproved of reliance on such generalizations from law enforcement, even when such generalizations relate to search warrants and not to the defendant's guilt during trial, as did the generalizations here. In State v. Thein, 138 Wash.2d 133, 136-39, 977 P.2d 582 (1999), police officers searched Thein's residence under a search warrant based on evidence that he was a drug dealer and the officers' generalized statements of belief that drug dealers store contraband at their home. On review, our Supreme Court rejected the State's proposed rule that "it is reasonable to infer evidence of drug dealing will likely be found in the homes of drug dealers" because it "would broaden `to an intolerable degree' the strict requirement that probable cause to search a certain location must be based on a factual nexus between the evidence sought and the place to be searched." Thein, 138 Wash.2d at 147-148, 977 P.2d 582 (emphases omitted) (quoting State v. Olson, 73 Wash. App. 348, 357, 869 P.2d 110 (1994)). Focusing on the officers' generalized statements, the court observed that "[b]lanket inferences of this kind substitute generalities for the required showing of reasonably specific `underlying circumstances'" showing that a nexus exists. Thein, 138 Wash.2d at 147, 977 P.2d 582. It reiterated that "`[p]robable cause to believe that a man has committed a crime ... does not necessarily give rise to probable cause to search his home.'" Thein, 138 Wash.2d at 148, 977 P.2d 582 (alterations in original) (quoting State v. Dalton, 73 Wash.App. 132, 140, 868 P.2d 873 (1994)). Thus, it held that this evidence alone was insufficient to establish probable cause for a search warrant. Thein, 138 Wash.2d at 151, 977 P.2d 582. Similarly, it follows that such generalized statements alone also fail to satisfy the State's burden at trial to prove the gang aggravator beyond a reasonable doubt, a higher burden than probable cause to search or arrest. See Brinegar v. U.S., 338 U.S. 160, 174-75, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) (probable cause is a lesser standard of proof than reasonable doubt).
¶ 35 The only specific evidence regarding Bluehorse's potential retaliatory motive appears to be Francis's making gang signs in response to Bluehorse doing the same. But according to Francis, these encounters took place during the five to six month period from August 2006 through January 2007, approximately six months before the July 5, 2007, shooting. The State presented no evidence that Bluehorse announced a rival gang status contemporaneously with the shooting or that he had recently confronted and been disrespected or provoked by rival gang members, which would, according to Bair and Frisbee, give rise to a contemporaneous gang requirement or desire to retaliate.[19] Further, *547 the State presented no evidence that Bluehorse made any statements that he wanted to advance his position in a gang or committed the drive-by shooting for reasons related to gang status. Bluehorse testified that he was not a gang member, despite his family's gang connections. Thus, unlike in Yarbrough, Monschke, Johnson, and Smith, the State presented no evidence showing that Bluehorse committed the July 5 shooting for reasons related to obtaining or maintaining gang membership or advancing in the gang.
¶ 36 The evidence supports an inference that Bluehorse was involved in this drive-by shooting, but without evidence relating to Bluehorse's motivation, the gang sentencing aggravator would be intolerably broadened by allowing it to attach automatically whenever an aspiring or full gang member is involved in a drive-by shooting based on the detectives' generalized gang testimony; thus relieving the State of its burden to prove beyond a reasonable doubt that the specific defendant charged with a drive-by shooting sought to obtain, maintain, or advance his gang membership under RCW 9.94A.535(3)(s) and RCW 9.94A.537(3).
¶ 37 We conclude that substantial evidence did not establish Bluehorse's motivation to obtain, maintain, or advance gang membership by being involved in the July 5 drive-by shooting. Thus, we hold that the evidence does not support the jury's special verdict that he committed the July 5 shooting to advance or maintain his status in a gang and that imposition of the exceptional sentence was clearly erroneous.

B. Reasons Underlying Exceptional Sentence Length
¶ 38 Bluehorse also contends that the trial court's reasons for imposing an exceptional sentence were not substantial and compelling because (1) the trial court relied on facts constituting first degree assault in its reasoning, thus, violating the real facts doctrine, when (2) the circumstances of this case were no worse than other drive-by shootings. The State did not respond to these arguments in its briefing.
¶ 39 We review de novo whether the trial court's reasons for imposing an exceptional sentence were substantial and compelling. Hale, 146 Wash.App. at 308, 189 P.3d 829. The real facts doctrine prohibits trial courts from relying on facts that constitute the elements of a more serious crime that the State did not charge or prove. State v. Wakefield, 130 Wash.2d 464, 475-76, 925 P.2d 183 (1996); former RCW 9.94A.530(3) (2005). Former RCW 9.94A.530(3) provided in pertinent part that "[f]acts that establish the elements of a more serious crime or additional crimes may not be used to go outside the standard sentence range."
¶ 40 The State charged and convicted Bluehorse of drive-by shooting. A person commits the crime of drive-by shooting, a class B felony, when he
recklessly discharges a firearm ... in a manner which creates a substantial risk of death or serious physical injury to another person and the discharge is either from a motor vehicle or from the immediate area of a motor vehicle that was used to transport the shooter or the firearm, or both, to the scene of the discharge.
RCW 9A.36.045(1), (3). The standard range sentence for drive-by shooting with an offender score of zero is 15 to 20 months. RCW 9.94A.510, .515. In contrast, a person commits first degree assault, a class A felony, if he, "with intent to inflict great bodily harm, [a]ssaults another with a firearm" or "[a]ssaults another and inflicts great bodily harm." RCW 9A.36.011(1)(a), (c). The standard range sentence for first degree assault with an offender score of zero is 93 to 123 months. RCW 9.94A.510, .515.
¶ 41 At sentencing, the prosecutor argued, and the trial court agreed, that "this particular offense resembles much more an Assault in the First Degree than merely the drive-by given that someone was instead shot." 15 RP (Sept. 12, 2008) at 1822. Although the trial court referred to the gang aggravator based on the danger posed to bystanders by the drive-by shooting as a basis for an exceptional sentence, it based its sentence on the 93 to 123 month standard range for first degree assault to arrive at a midpoint of 108 months, the exceptional sentence imposed *548 here. Moreover, the trial court noted that this resulted in a "neat equivalence" with Kevin Abuan's sentence of 108 months on his conviction for one count of drive-by shooting and two counts of second degree assault, based on his offender score of four. 15 RP (Sept. 12, 2008) at 1824.
¶ 42 It thus appears that, in sentencing Bluehorse to the midrange for first degree assault, the trial court impermissibly relied on its determination that the facts of this case constituted the more serious uncharged, unproved crime of first degree assault. In doing so, the trial court violated the real facts doctrine and failed to give substantial and compelling reasons for imposing the particular exceptional sentence.
¶ 43 Further, the trial court indicated that another reason for imposing the exceptional sentence was that, because of Bluehorse's actions, "this whole neighborhood was, for months, terrorized." 15 RP (Sept. 12, 2008) at 1824. This appears to reflect the "community impact," nonstatutory aggravating factor relied on in Johnson to justify the exceptional sentence. 124 Wash.2d at 64-66, 75-76, 873 P.2d 514. But the aggravating factor statute relied on in Johnson enumerated only an illustrative, nonexclusive list of aggravating factors. Former RCW 9.94A.390 (1990); Johnson, 124 Wash.2d at 66, 873 P.2d 514. In contrast, the plain language of RCW 9.94A.535(3) contains an exclusive list of aggravating factors. "Community impact" is not one of them. RCW 9.94A.535 requires a finding by the jury of one of the enumerated aggravating factors. Here, even had "community impact" been enumerated, the jury did not return a special verdict that Bluehorse's crimes had a "community impact" relevant to an exceptional sentence. Thus, the trial court's reliance on "community impact" fails to constitute a substantial and compelling reason for imposing the exceptional sentence.

C. Exceptional Sentence Clearly Excessive Because It Violated Real Facts Doctrine
¶ 44 Finally, we review a trial court's imposition of an exceptional sentence to determine if it is clearly excessive; if so, the sentence is the result of an abuse of discretion. Hale, 146 Wash.App. at 308, 189 P.3d 829. The trial court may exercise its discretion to determine the precise length of the exceptional sentence appropriate on a determination of substantial and compelling reasons supported by the jury's aggravating factor finding. State v. Kolesnik, 146 Wash. App. 790, 805, 192 P.3d 937 (2008), review denied, 165 Wash.2d 1050, 208 P.3d 555 (2009). "A `clearly excessive sentence is one that is clearly unreasonable, i.e., exercised on untenable grounds or for untenable reasons, or an action that no reasonable person would have taken.'" Kolesnik, 146 Wash.App. at 805, 192 P.3d 937 (emphasis omitted) (quoting State v. Ritchie, 126 Wash.2d 388, 393, 894 P.2d 1308 (1995)).
¶ 45 Here, the trial court failed to base its imposition of an exceptional sentence on substantial and compelling facts based on the jury's verdict finding Bluehorse guilty of drive-by shooting with a gang aggravator. Instead, the length of the exceptional sentence imposed was clearly based on a standard range sentence for first degree assault, and, apparently, to achieve parity with Abuan's sentence On his conviction for one count of drive-by shooting and two counts of second degree assault, based on Abuan's offender score of four. The sentence imposed clearly violates the real facts doctrine since the State neither charged Bluehorse with first degree assault nor proved the elements of first degree assault.
¶ 46 Accordingly, we reverse and vacate Bluehorse's exceptional sentence. Because we determine that substantial evidence does not support the jury's gang aggravator finding, we remand for resentencing within the standard range. We briefly address Bluehorse's other arguments that relate to his conviction on the drive-by shooting charge.

III. STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW
¶ 47 Bluehorse raises additional claims pro se in his SAG. He contends: (1) the trial court violated his public trial right under article I, section 22 of our state constitution; (2) the State engaged in vindictive prosecution; *549 and (3) cumulative error requires reversal of his conviction based on the trial court's denial of a motion for mistrial based on conversations jury members overheard and a witness's prejudicial statement, the trial court's grant of a midtrial two month recess, and the State's "flagrant" use of police reports to refresh the memory of witnesses. SAG at 24.

A. Public Trial Right
¶ 48 We review de novo whether the public trial right has been violated. State v. Momah, 167 Wash.2d 140, 147, 217 P.3d 321 (2009), cert. denied, ___ U.S. ___, 131 S.Ct. 160, 178 L.Ed.2d 40 (2010). But for there to be a violation of this right, a closure of the courtroom to the public must have occurred. Momah, 167 Wash.2d at 148-49, 217 P.3d 321. Here, the portions of the record Bluehorse cites as closures indicate only that the trial court held the proceedings outside the presence of the full venire panel or jury members, not the public. This claim fails.

B. Vindictive Prosecution
¶ 49 Second, in support of his vindictive prosecution argument, Bluehorse cites cases involving amendment of the charges after the State rested its case. Here, the State made no such amendment; thus, these cases are not applicable and this claim fails.

C. Denial of Mistrial Motions
¶ 50 We review the denial of a motion for mistrial for abuse of discretion. State v. Greiff, 141 Wash.2d 910, 921, 10 P.3d 390 (2000). A trial court abuses its discretion when it bases its decision on unreasonable or untenable grounds. State v. Rafay, 167 Wash.2d 644, 655, 222 P.3d 86 (2009), reconsideration denied (Jan. 19, 2010). We uphold a trial court's decision to deny a mistrial motion unless the irregularities, when viewed in the context of all the evidence, so tainted the entire proceeding that the defendant was denied a fair trial. State v. Post, 118 Wash.2d 596, 620, 826 P.2d 172, 837 P.2d 599 (1992). When Francis testified that Bluehorse was the primary NGC shooter, defense counsel immediately objected and the trial court instructed the jury to disregard the statement. We presume the jury followed the court's instructions. State v. Warren, 165 Wash.2d 17, 29, 195 P.3d 940 (2008). Likewise, the trial court instructed jurors five and nine to disregard what they overheard and to not use it in evaluating the case. Again, we presume that the jurors followed these instructions and absent evidence to the contrary, these claims fail.

D. Recess During Trial
¶ 51 We review the trial court's grant of a recess for abuse of discretion. State v. Delarosa-Flores, 59 Wash.App. 514, 516, 799 P.2d 736 (1990). Regarding the two month recess during the trial, Bluehorse admits that "the court and all parties agreed to this delay." SAG at 23. This claim also fails.

E. Refreshing Witnesses' Memories
¶ 52 Bluehorse fails to inform us of the "nature and occurrence of [the] alleged errors," RAP 10.10(c), in claiming that the State erroneously used police reports to refresh witnesses' memories. This assertion of error is too vague to allow us to identify the issue and we do not discuss it further.

F. Cumulative Error
¶ 53 Finally, "[c]umulative error may warrant reversal, even if each error standing alone would otherwise be considered harmless." State v. Weber, 159 Wash.2d 252, 279, 149 P.3d 646 (2006). Because we hold that the trial court erred only in sentencing Bluehorse and we reverse the exceptional sentence it imposed; Bluehorse's cumulative error assertion also fails.
¶ 54 We affirm Bluehorse's conviction but reverse and vacate his exceptional sentence and remand for resentencing within the standard range.
We concur: ARMSTRONG and HUNT, JJ.
NOTES
[1] This case was originally consolidated with Kevin Abuan's appeal under Court of Appeals cause number 38325-0-II. We have deconsolidated them for purposes of rendering an opinion pertinent to each case.
[2] "Under the real facts doctrine, a trial court may not impose a sentence based on the elements of a more serious crime." State v. Wakefield, 130 Wash.2d 464, 475-76, 925 P.2d 183 (1996).
[3] RAP 10.10.
[4] At trial, Tacoma Police Detective John Bair testified as a gang expert. According to Bair's testimony, many smaller gangs affiliate with either the Bloods or the Crips. Bloods associate with the color red, while Crips associate with the color blue. According to Tacoma Police Officer Randall Frisbee, who was specifically assigned to gang cases, Crips and Bloods traditionally oppose each other but there can be exceptions. Bair testified that Crips and Bloods sometimes commit major crimes together. He also testified that individuals may commit crimes to obtain gang membership or to advance their status in the gang.
[5] For clarity, we refer to Fomai Leoso and Francis Leoso by their first names.
[6] The record indicates that the shooting occurred "early July 5th." 5 Report of Proceedings (RP) at 497. The State charged Bluehorse in connection with a shooting on July 5. Thus, we subsequently refer to this event as the July 5 shooting.
[7] "Duck" meant to duck down. 10 RP at 1267. "[L]oc" was a phrase that Crip gang members called each other. 10 RP at 1268.
[8] On August 22, Fomai identified Bluehorse in a police "photo montage" as the July 5 shooter. 5 RP at 495.
[9] This charge was tried along with the charges relating to the July 5 shooting in a joint trial with Kevin Abuan, the case originally consolidated with this appeal under cause number 38325-0-II. See footnote 1. With regard to the August 15 shooting, Francis testified that he heard someone say, "`N-G-C, cuz,'" before the shooting, and he identified Bluehorse as the shooter. 8 RP at 1016. Abuan admitted to gang membership and stated that he thought the intent of the drive-by was only to flash gang signs. Abuan did not implicate Bluehorse as a participant in the August 15 shooting, and Bluehorse presented an alibi defense. The jury found Bluehorse not guilty of the August 15 shooting and it is not an issue on appeal. The jury convicted Abuan of the August 15 shooting but it did not find that he committed it to obtain or maintain his gang membership or advance his gang status, even though he admitted to gang membership and that the drive-by's purpose was to flash gang signs. In contrast, here the jury found that Bluehorse committed the July 5 shooting to obtain or maintain his gang membership or advance his gang status despite his denial that he was a gang member, although he testified that people assumed he was a gang member because some of his family members were NGCs.
[10] During trial, Francis also testified that Bluehorse was the primary NGC shooter. Defense counsel immediately objected and the trial court instructed the jury to disregard the statement. Defense counsel also unsuccessfully moved for a mistrial based on this testimony.
[11] "Hoke" or "Hokie" is Bluehorse's brother, Hokeshina Tolbert. 5 RP at 432.
[12] The record contains two sections of the report of proceedings labeled as volume 15. The first contains the trial proceedings on August 18, 2008. The second contains the sentencing proceedings for Abuan and Bluehorse on September 12, 2008. For clarity, we cite to the latter volume 15 as "15 RP (Sept. 12, 2008)."
[13] Both defense counsel and the trial court referred to this uncharged, potential crime as first degree assault without correction from the prosecutor.
[14] First degree assault has a standard range sentence of 93 to 123 months with an offender score of zero, as subsequently and correctly stated by the trial court. RCW 9.94A.510, .515.
[15] The trial court observed that this is the same sentence it imposed on the codefendant Kevin Abuan, who was convicted of the August 15 shooting and whose offender score was four.
[16] Former RCW 9.94A.390(2) (1990), recodified as RCW 9.94A.535(2) (LAWS OF 2001, ch. 10, § 6).
[17] In 1989, when Smith committed the murder, "furtherance of a criminal enterprise" was not an enumerated aggravating factor supporting either an exceptional sentence or an aggravated first degree murder charge. Smith, 64 Wash. App. at 622-23, 825 P.2d 741; former RCW 9.94A.390(2) (1989) (exceptional sentence aggravating circumstances); former RCW 10.95.020 (1989) (first degree murder aggravating circumstances).
[18] Because this aggravating factor language is identical to the aggravating factor language of RCW 9.94A.535(3)(s), the analysis of evidence supporting the aggravating factor in Monschke applies here.
[19] We note that such evidence existed regarding the August 15 drive-by shooting, as Francis testified that someone shouted, "N-G-C, cuz" before the shooting began. 8 RP at 1016. But the jury acquitted Bluehorse of this shooting. The jury convicted Abuan of the August 15 shooting but did not return a finding that the State had proven the gang aggravator despite this evidence. State v. Abuan, No. 38325-0-II, Clerk's Papers at 214, 218 (Wash. Ct.App. argued Oct. 14, 2010) (jury verdict forms).