FILED
COURT OF APPEALS
DIVISION II

2013 JUL 23 AM 9: 14

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 42176-3-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| JACOB MEJIA, | |
| Appellant. | |

BJORGEN, J. — Jacob Mejia appeals his convictions and sentences for first degree assault and second degree criminal mistreatment. He argues that: (1) his counsel provided ineffective assistance because he failed to object under ER 403 and 404(b) to evidence of certain other acts and failed to request a limiting instruction for that evidence, (2) insufficient evidence supports his convictions, (3) the sentencing court erred by imposing an exceptional sentence without entering findings of fact and conclusions of law, and (4) the exceptional sentence was excessive. Finding no error as Mejia alleges, we affirm his convictions and sentence.

## FACTS

### I. INFANT INJURY

Mejia's and Sarah Tate's son, AMM[1] was born on November 6, 2008. On the morning of December 22, Tate asked Mejia to change AMM's diaper after he was finished feeding the baby. Tate left the room to take a 10 to 15 minute shower, and while she was in the shower, she

---

[1] This opinion uses initials to protect the privacy of the juvenile victim.

heard AMM cry. After finishing her shower, Tate began playing a computer game, when she heard a thump and AMM cry again.

Tate ran out to the living room, as did Mejia, who had been in the kitchen getting coffee. Mejia scooped up AMM from the carpeted floor near the couch or loveseat where he had left the baby. According to Detective Lori Blankenship, the seat of the couch/loveseat was 19 inches above the floor. AMM was making "really soft cries" that Tate thought, "just did not seem right." 5 Verbatim Report of Proceedings (VRP) at 841-42. Tate noticed that AMM could not keep his eyes open and told Mejia that she wanted to take him to the hospital, but Mejia wanted to call his parents and ask what to do. Tate put an ice pack on the bump on AMM's head, and Mejia called his mother, who said she would be home shortly. Mejia and Tate took AMM into their room and searched the internet for advice while they waited for Mejia's mother.

Late that night, AMM started having seizures, with shaking all down his left side. Mejia, Tate, and Mejia's parents took AMM to the hospital. An examination by Dr. Marvin Valrey in the emergency room revealed that AMM had a skull fracture, a left frontal subdural hematoma, and a second subdural on the right side of the brain. Dr. Valrey determined that AMM's injuries were life threatening.

The hospital staff airlifted AMM to a hospital with a pediatric intensive care unit. At that hospital, doctors discovered that in addition to a skull fracture and two subdural hematomas, AMM had multiple rib fractures, a fractured left clavicle, and a fractured right humerus, and determined that he was suffering from severe, life-threatening trauma. The next morning, the hospital staff had to perform emergency cardiac pulmonary resuscitation (CPR) on AMM to

resuscitate him. The child's injuries included extensive nonrecoverable brain damage and some brain shrinkage. AMM will need significant care for the rest of his life.

## II. THE TRIAL

The State charged Mejia with one count of first degree assault[2] and one count of second degree criminal mistreatment.[3] Each count included a domestic violence special allegation,[4] and an aggravating circumstance allegation for a particularly vulnerable victim.[5]

Extensive medical and other testimony was presented at trial. Dr. Jacqueline Ann Hrivnak, a pediatric neurologist, described AMM's magnetic resonance imaging (MRI) results showing subdural hemorrhages, brain damage, and a right parietal skull fracture. Dr. Hrivnak told the jury that she diagnosed AMM as having suffered physical abuse because there was no other adequate explanation for his various injuries, and his "whole picture" fit that diagnosis. 1 VRP at 163-64. Dr. Hrivnak also testified that either something hit AMM's head or AMM's head hit something else. Finally, Dr. Hrivnak testified that the injuries would be consistent with someone shaking the baby and then striking his head against something, but she stated that the injuries could also occur without the shaking.

Dr. Yolanda Duralde, the medical director of the hospital's child abuse intervention department, testified that she treated AMM for an arm fracture that November when AMM was 13 days old. She testified that Mejia had told her that when he attempted to swaddle AMM, he

---

[2] RCW 9A.36.011(1).

[3] RCW 9A.42.030.

[4] RCW 10.99.020.

[5] RCW 9.94A.535(3)(b).

3

had tucked AMM's arms behind his back to keep him from flailing. Dr. Duralde testified that because nothing in the medical history at that time indicated other injuries or problems, she concluded that AMM's fractured arm was an accident. Dr. Duralde testified that she had told Mejia that he was stupid, which was an unusual comment, but she believed that the injury was not purposeful. She further testified that she tested AMM in November, determining that he did not have a vitamin D deficiency, brittle bones, or some other congenital problem that made him prone to fractures. She stated that although AMM had an arm fracture, in November he had been a healthy, beautiful, glorious, and vigorous baby.

Dr. Duralde also testified about the incident in December. She said that when she examined AMM on December 28, he looked totally different than he did in November. Dr. Duralde testified that AMM had "sustained a severe inflicted head injury." 2 VRP at 301. She further testified that AMM's injury "would not be the result of a simple fall," meaning anything less than four feet. 2 VRP at 302. She also testified that doctors see AMM's type of injury when there has been acceleration/deceleration forces placed on the brain, such as occur from shaking. She further testified that because AMM was an infant, the CPR he had received on December 23 would not have caused his rib fractures. Dr. Duralde reiterated that there is not enough force in a short fall to have caused AMM's devastating injury. She stated that in her opinion, AMM's trauma was intentionally inflicted.

Dr. Valrey, the emergency room physician, testified about medical care provided to AMM on both December 22 and November 18. Dr. Valrey testified that on December 22, he diagnosed AMM's situation as needing further investigation for child abuse.

4

Dr. Lilian Angelica Lupu, an intensive care pediatrician, also treated AMM in December. Dr. Lupu testified that a fall from a couch to the floor would not have caused AMM's injuries and that a forceful impact would have had to be involved.

Dr. Patrick Barnes is a pediatric radiologist and neuro-radiologist. He did not see AMM as a patient but he reviewed AMM's records. Dr. Barnes testified that the medical imaging did not conclusively show whether AMM's injuries were nonaccidental and did not exclude that AMM was medically predisposed to traumatic injury. Dr. Barnes questioned whether AMM's fracture from November had healed properly, highlighting a possible adverse reaction. Further, Dr. Barnes testified that it was possible that AMM had "fragile bone disorder," noting that vitamin D deficiency is common in Washington. 5 VRP at 747. Dr. Barnes testified that he did not see an evaluation for AMM's vitamin D levels and concluded that he could not rule out a fragile bone disorder based on the medical imaging records.

Dr. John J. Plunkett is a forensic pathology consultant, who did not treat AMM as a patient but who reviewed the records. Dr. Plunkett testified that AMM's medical information could not conclusively show whether someone inflicted AMM's injuries or whether the injuries occurred accidentally.

Dr. Naomi Sugar is a medical director for assault and traumatic stress. She did not treat AMM as a patient, but the police asked her to examine AMM's records. She testified that it was highly unlikely that AMM's severe, multiple injuries were the result of a simple fall. Rather, she stated, the medical findings showed an inflicted trauma.

Detective Lori Blankenship testified that Mejia told her that on December 23 he had fed AMM, changed his diaper, and placed him in the center of the loveseat while he went to make

5

coffee. He told her that while he was making coffee, he heard a thump and ran back to the living room to see AMM lying on his back on the living room floor. He told Detective Blankenship that the dog was jumping off the loveseat at the same time. Detective Blankenship testified that she visited Mejia's residence and attempted to recreate the incident as described by Mejia. She said that she tried to convince the family dog to jump on the loveseat; but she was unsuccessful. She also tried to bump stuffed animals off the loveseat by sitting down forcefully; but she was again unsuccessful.

Kimberly Dawn Mejia testified about the physical space in her home, where AMM's injury occurred. She stated that there were no coffee tables or other hard objects near the couch and there was carpet with a pad on the floor.

The jury found Mejia guilty on both charges and affirmed the domestic violence and particularly vulnerable victim special allegations. The court sentenced Mejia to an exceptional sentence of 300 months for first degree assault. Mejia appeals.

## ANALYSIS

Mejia's appeal rests on four arguments: (1) that his counsel gave ineffective assistance because he failed to object to evidence of AMM's November arm fracture and failed to request a limiting instruction for that same evidence, (2) that insufficient evidence supports his convictions, (3) that the sentencing court erred by imposing an exceptional sentence without entering findings of fact and conclusions of law, and (4) that the exceptional sentence was excessive. Each of these are considered below.

6

## I. ASSISTANCE OF COUNSEL

### A.   Standard of Review

Washington follows the test for ineffective assistance of counsel set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). In order to show that he received ineffective assistance, Mejia must show (1) that defense counsel's conduct was deficient and (2) that the deficient performance resulted in prejudice. *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004). Deficient performance is that which falls below an objective standard of reasonableness. *In re Det. of Moore*, 167 Wn.2d 113, 122, 216 P.3d 1015 (2009). Prejudice occurs where there is a reasonable probability that, but for the deficient performance, the outcome of the proceedings would have been different. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). A legitimate tactical decision does not constitute ineffective assistance of counsel. *State v. Grier*, 171 Wn.2d 17, 38, 246 P.3d 1260 (2011), *remanded*, 168 Wn. App. 635 (2012).

Where the defendant claims ineffective assistance based on counsel's failure to challenge the admission of evidence, the defendant must show (1) an absence of legitimate strategic or tactical reasons supporting the challenged conduct, (2) that an objection to the evidence would likely have been sustained, and (3) that the result of the trial would have been different had the evidence not been admitted. *State v. Saunders*, 91 Wn. App. 575, 578, 958 P.2d 364 (1998). Because Mejia fails to show the absence of legitimate strategic or tactical reasons, his claim of ineffective assistance fails.

B.    Evidence of November Arm Fracture

As noted, Mejia argues that his trial counsel provided ineffective assistance because he failed to object to evidence of AMM's November arm fracture. This argument, however, overlooks the fact that Mejia used that evidence to support a theory of his case: that AMM might have a fragile bone disorder and be unusually susceptible to fractures. For example, Dr. Barnes discussed AMM's fractured arm, highlighting a possible adverse reaction and questioning whether the fracture had healed properly. Dr. Barnes noted further that it was possible AMM had "fragile bone disorder" and that vitamin D deficiency is common in Washington. 5 VRP at 747.

Our Supreme Court has held that it "will not find ineffective assistance of counsel if 'the actions of counsel complained of go to the theory of the case or to trial tactics.'" *Grier*, 171 Wn.2d at 33 (quoting *State v. Renfro*, 96 Wn.2d 902, 909, 639 P.2d 737 (1982)). As shown, Mejia used evidence of the November fracture as part of his trial tactics in service of a theory of his case. Therefore, the absence of an objection to evidence of the November fracture did not constitute ineffective assistance of counsel.

C.    No Limiting Instruction

Mejia next argues that his trial counsel provided ineffective assistance because he failed to request a limiting instruction regarding evidence of AMM's November arm fracture. The State responds that Mejia's counsel had several legitimate tactical reasons for not requesting such an instruction. The State is correct.

As held in *Grier*, 171 Wn.2d at 38, a legitimate tactical decision does not constitute ineffective assistance of counsel. Here, counsel could reasonably have thought that a limiting

8

instruction would have compromised his argument that AMM had fragile bones or an argument that Dr. Duralde was biased against Mejia or that AMM's injuries pre-dated the December incident. Additionally, the reviewing court can presume that counsel made a tactical decision not to request a limiting instruction regarding evidence of prior bad acts, because a limiting instruction might reemphasize damaging evidence. *State v. Price*, 126 Wn. App. 617, 649, 109 P.3d 27, *review denied*, 155 Wn.2d 1018 (2005).

Under these circumstances, the failure to request a limiting instruction did not constitute ineffective assistance of counsel.

## II. SUFFICIENT EVIDENCE

Mejia next argues that insufficient evidence supports his first degree assault conviction, because there was evidence to support a finding that AMM's injury occurred accidentally instead of intentionally. Mejia also argues that insufficient evidence supports his second degree criminal mistreatment conviction, because there was evidence that AMM appeared to be fine until later that evening and that, therefore, Mejia did not recklessly delay seeking medical attention.

A.      Standard of Review

When reviewing a challenge to sufficiency of the evidence, this court considers the evidence in the light most favorable to the State and determines whether any rational trier of fact could have found the crime's essential elements beyond a reasonable doubt. *State v. Williams*, 137 Wn. App. 736, 743, 154 P.3d 322 (2007). In this review, the court draws all reasonable inferences from the evidence in the State's favor and interprets the evidence "'most strongly against the defendant.'" *State v. Joy*, 121 Wn.2d 333, 339, 851 P.2d 654 (1993) (quoting *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)). The reviewing court considers both

circumstantial and direct evidence as equally reliable, and defers to the trier of fact on issues of conflicting testimony, witness credibility, and the persuasiveness of the evidence. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

B.      First Degree Assault

Mejia first argues that insufficient evidence supports his first degree assault[6] conviction, because there was evidence to support a finding that AMM's injury occurred accidentally rather than intentionally. Br. of Appellant at 32. This argument misunderstands the nature of the test. As just noted, in considering a sufficiency argument this court considers the evidence in the light most favorable to the State and determines whether any rational trier of fact could have found the crime's essential elements beyond a reasonable doubt. *Williams*, 137 Wn. App. at 743. Thus, Mejia's argument that it is "not impossible" that a simple fall caused all of AMM's December injuries is wholly beside the point. *See* Br. of Appellant at 32-33.

Here, the State presented evidence that Mejia was upset because Tate had told him how to care for AMM and that AMM, while in Mejia's care, suffered a life threatening injury that several experts believed could not have been caused by a simple fall. As stated, this court considers both circumstantial and direct evidence as equally reliable, and defers to the trier of fact on issues of conflicting testimony, witness credibility, and the persuasiveness of the

---

[6] RCW 9A.36.011 provides:
> (1) A person is guilty of assault in the first degree if he or she, with intent to inflict great bodily harm:
> (a) Assaults another with a firearm or any deadly weapon or by any force or means likely to produce great bodily harm or death; or
> (b) Administers, exposes, or transmits to or causes to be taken by another, poison, the human immunodeficiency virus as defined in chapter 70.24 RCW, or any other destructive or noxious substance; or
> (c) Assaults another and inflicts great bodily harm.

evidence. *Thomas*, 150 Wn.2d at 874-75. Following these standards, a rational trier of fact could have found from this evidence that Mejia intentionally injured AMM while the child was in Mejia's exclusive care. Sufficient evidence was admitted to sustain the conviction for first degree assault.

C.     Second Degree Criminal Mistreatment

Next, Mejia argues that insufficient evidence supports his second degree criminal mistreatment[7] conviction, because there was evidence that AMM appeared to be fine until later that evening, showing that Mejia's delay in seeking medical care was not reckless. Again, Mejia's argument overlooks the evidence supporting the jury's decision.

The State presented evidence that for 20 minutes AMM could not hold his eyes open and was making "really soft cries" that his mother felt "just did not seem right." 5 VRP at 841-42. Additionally, the jury could rely on the same evidence that it used to determine that Mejia intentionally injured AMM to conclude that because Mejia knew what he did, he must also know that AMM required medical care. Thus, although there was evidence that AMM did not actively display trauma symptoms in the afternoon, a rational trier of fact could conclude that Mejia recklessly delayed seeking AMM's medical care. *Williams*, 137 Wn. App. at 743.

---

[7] RCW 9A.42.030 provides:
> (1) A parent of a child, the person entrusted with the physical custody of a child or dependent person, a person who has assumed the responsibility to provide to a dependent person the basic necessities of life, or a person employed to provide to the child or dependent person the basic necessities of life is guilty of criminal mistreatment in the second degree if he or she recklessly, as defined in RCW 9A.08.010, either (a) creates an imminent and substantial risk of death or great bodily harm, or (b) causes substantial bodily harm by withholding any of the basic necessities of life.

Under the standards set out above, sufficient evidence was admitted to sustain the conviction for second degree criminal mistreatment.

### III. EXCEPTIONAL SENTENCE

A.    The Absence of Findings and Conclusions

Mejia argues that this court should reverse and remand for resentencing, because the trial court imposed an exceptional sentence for first degree assault without entering written findings and conclusions.

Mejia is correct that RCW 9.94A.535 states that "[w]henever a sentence outside the standard sentence range is imposed, the court shall set forth the reasons for its decision in written findings of fact and conclusions of law." *See State v. Hale*, 146 Wn. App. 299, 304 n.2, 189 P.3d 829 (2008). It is also the law, though, that when the trial court's oral ruling states that the jury's finding of an aggravator supports imposition of an exceptional sentence, the record is sufficiently clear for effective appellate review. In that case, we need not remand for entry of written findings and conclusions. *State v. Bluehorse*, 159 Wn. App. 410, 423, 248 P.3d 537 (2011).

Here, the trial court noted that the jury returned a special verdict finding the aggravating circumstance that Mejia committed the crime against a particularly vulnerable victim. The trial court stated that it found the aggravating factors outweighed any leniency the law afforded. The trial court further explained the exceptional sentence saying:

> [AMM] was a beautiful, defenseless baby, and he had no choice but to trust that he would be protected, nurtured, and cared for. Instead, his own parent let him down, not with neglect, but as the jury has found, with intent, and he has been damaged forever. He had no choice but to trust you.

VRP (May 23, 2011) at 47.

12

The trial court stated further that with "great sadness" it was "going to go over the standard range" of 120 to 160 months for first degree assault and instead impose 300 months, along with 17 months for second degree criminal mistreatment, to run concurrently. VRP (May 23, 2011) at 47-48. Additionally, Mejia's judgment and sentence attests that the trial court imposed an exceptional sentence for a "substantial and compelling" reason and that the prosecutor recommended a similar sentence. Clerk's Papers at 112.

This record makes clear that the trial court's oral ruling acknowledged that the jury found an aggravating circumstance and explained why that supported imposition of an exceptional sentence. Under *Bluehorse*, 159 Wn. App. at 423, this supplies an adequate basis for review, even without findings and conclusions by the trial court.

B.     Claim of Excessive Sentence

Mejia argues also that if this court determines that the record is sufficient to allow review of the exceptional sentence, it should hold that a sentence 140 months above the standard range is clearly excessive under RCW 9.94A.585. The State responds that Mejia does not offer any supporting authority and the record shows that the trial court did not abuse its discretion in imposing the exceptional sentence.

We review whether an exceptional sentence is excessively long for abuse of discretion. *State v. Ritchie*, 126 Wn.2d 388, 392, 894 P.2d 1308 (1995). Our Supreme Court has held that although state statute requires the trial court to set forth reasons for its decision to impose an exceptional sentence, there is no corresponding statutory requirement to articulate reasons for the length of an exceptional sentence, and the trial court need not do so. *Ritchie*, 126 Wn.2d at 392.

No. 42176-3-II

The basic standard for review of an exceptional sentence is set forth in RCW 9.94A.585(4), which states:

> To reverse a sentence which is outside the standard sentence range, the reviewing court must find: (a) Either that the reasons supplied by the sentencing court are not supported by the record which was before the judge or that those reasons do not justify a sentence outside the standard sentence range for that offense; or (b) that the sentence imposed was clearly excessive or clearly too lenient.

The trial court abuses its discretion when the sentence's length is clearly unreasonable, exercised on untenable grounds or reasons, or constitutes an action that no reasonable person would take. *State v. Oxborrow*, 106 Wn.2d 525, 531, 723 P.2d 1123 (1986).

Mejia argues that this sentence was excessive because he consistently stated that AMM fell off the couch and no one can say with certainty that the fall did not cause AMM's injuries. The jury, however, decided that question against Mejia when it convicted him of first degree assault. Thus, Mejia's argument has no bearing on whether the length of his sentence was excessive. Additionally, Mejia argues that he did not prevent Tate from taking AMM to the hospital. This point, though, only touches Mejia's conviction for second degree criminal mistreatment, and no exceptional sentence was imposed for that crime.

The jury below found Mejia guilty of first degree assault and also found the aggravating circumstance that Mejia committed the crime against a particularly vulnerable victim. The standard range sentence for first degree assault without an aggravator is 120 to 160 months. The trial court stated that it found the aggravating factors outweighed any leniency the law afforded and sentenced Mejia to 300 months, because he committed the first degree assault against his own baby. Under RCW 9.94A.585(4) and *Oxborrow*, this sentence is not an abuse of discretion and must be upheld.

14

No. 42176-3-II

We affirm the convictions and sentences.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

BJORGEN, J.

We concur:

QUINN-BRINTNALL, J.

JOHANSON, A.C.J.

15