**FILED**
**MARCH 30 2023**
In the Office of the Clerk of Court
WA State Court of Appeals Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 38278-8-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CHRISTOPHER DONALD PETEK, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, C.J. — Christopher Petek appeals his conviction for first degree unlawful possession of a firearm and two counts of possession with intent to deliver an imitation controlled substance. Mr. Petek unsuccessfully moved to suppress evidence obtained in what he contended was an illegal "protective sweep" of the recreational vehicle (RV) outside of which he was arrested. He challenges the denial of his suppression motion. He also contends that even if the fruits of the sweep were properly admitted, the evidence is insufficient to sustain his convictions on the two imitation controlled substance counts.

The State failed to demonstrate a reasonable belief that the RV harbored an individual posing a danger to the arresting officers justifying a protective sweep, so the motion to suppress should have been granted. All of Mr. Petek's convictions are subject to reversal and remand for a new trial on that basis. In addition, we agree that Mr.

Petek's admission to possessing "fake heroin" and "fake meth" is inadmissible on corpus delicti grounds, and without his admission, there is insufficient evidence to establish that the substances he possessed were imitation rather than real. We direct the trial court to dismiss the imitation controlled substance charges with prejudice.

FACTS AND PROCEDURAL BACKGROUND

On December 30, 2020, detectives with the Stevens County Sheriff's Office assisted United States marshals in locating and arresting Christopher Petek on an outstanding Department of Corrections (DOC) warrant. After arresting Mr. Petek and detaining him and his girlfriend outside an RV in which the two were located, officers engaged in what they characterized as a protective sweep of the RV. During the sweep, they observed drug paraphernalia, some of which appeared to contain drug residue. They relied on their observations to obtain a search warrant, during which they seized evidence on which they relied to charge Mr. Petek with unlawful possession of a firearm in the first degree and two counts of possession with intent to deliver an imitation controlled substance.

Before trial, Mr. Petek moved to suppress the evidence seized when executing the warrant on the basis that it was fruits of an unconstitutional protective sweep. The trial court denied the motion. The matter proceeded to a trial at which Mr. Petek was found guilty.

Although much of the same evidence was presented at the CrR 3.5/3.6 hearing and trial, we rely on evidence presented at the CrR 3.5/3.6 hearing in elaborating on the protective sweep and the events leading up to it; we rely on evidence presented at trial in discussing the State's evidence of the crimes charged.

EVENTS LEADING UP TO THE PROTECTIVE SWEEP

The events leading up to the protective sweep are largely drawn from the trial court's unchallenged findings and conclusions on Mr. Petek's CrR 3.6 motion, which are verities on appeal. *State v. Carriero*, 8 Wn. App. 2d 641, 651, 439 P.3d 679 (2019) (citing *State v. Gaines*, 154 Wn.2d 711, 716, 116 P.3d 993 (2005)).

Stevens County Sheriff's Detective Mark Coon, other members of the Stevens County Sheriff's Office, and DOC officers joined U.S. marshals on December 30, 2020, in an effort to locate Mr. Petek and arrest him on an outstanding DOC warrant. The marshals' information was that Mr. Petek was staying in a fifth-wheel RV located on a nine-acre parcel in a remote area of Stevens County. The RV was known by law enforcement to be owned by Joseph Level.

Before arriving at the RV, the officers involved were aware that Mr. Petek was a convicted felon known to possess firearms. The Stevens County detectives were aware of pictures on Facebook that showed Mr. Petek holding what appeared to be firearms, posted alongside "Black Guns Matter" logos. Clerk's Papers (CP) at 155.

3

Mr. Level's RV was located, parked under a pole barn style roof with no walls. Tyvek wrap was hanging down, partially obstructing the view of the front door. Large amounts of debris and garbage surrounded the RV, restricting the space available for access. The snow-covered open area on the other side of the RV offered no safe place for law enforcement to take cover.

A vehicle known by law enforcement to be possessed and driven by Mr. Petek was visible when law enforcement arrived. Mr. Petek's vehicle displayed the same "Black Guns Matter" logos that law enforcement had seen posted on his Facebook page. CP at 155.

Mr. Petek recognized law enforcement on their arrival; they were in fully marked uniforms. He retreated inside the RV.

Although law enforcement repeatedly announced themselves, Mr. Petek initially refused to come out. He yelled that he did not trust law enforcement, that he would come out when he was ready, that he had to get dressed, and he wanted to talk to his wife. This went on for 10 to 20 minutes. Law enforcement could hear the sounds of conversation coming from inside the RV. It was not possible for law enforcement to ascertain how many people were in the RV. Law enforcement remained outside trying to talk Mr. Petek out of the RV because forced entry under the circumstances presented an elevated risk to officers.

Mr. Petek eventually stepped out of the RV. Immediately upon exit, he pulled the door shut behind him. As he came out, he was asked who else remained inside. He mentioned something about dogs being inside but initially said no one else was inside. Officers could still hear noises from inside the RV. Questioned about the noise, Mr. Petek eventually told officers that his girlfriend was inside.

As Mr. Petek was being taken into custody and placed in handcuffs, Detective Coon and Detective Travis Frizzell were outside the RV door. They announced their presence and a woman unlocked and opened the door, but backpedaled into the RV. Detective Frizzell reached in to grab her, at which point she complied in stepping out of the RV. She was passed to Detective Colton Schumacher. Detective Frizzell observed a dog running around the main living area as he was reaching in to pull the woman out.

Following her detention, the same level of noises still existed coming from the RV, including noises coming from the bedroom. According to Detective Schumacher, "We can't say if it's dogs or human, or what it is. But we heard noises just as we had before we pulled [the woman] out." 1 Rep. of Proc. (1 RP)[1] at 34.

---

[1] The record on appeal contains two nonconsecutively-numbered reports of proceedings and, given a number of "inaudible" entries in those reports, two related "narrative" reports of proceedings that contain selected pages of proceedings whose "inaudible" entries have been clarified.

We identify the report of motions heard in April 2021 as "1 RP" and its related narrative report as "1 NRP." The report of remaining proceedings, including trial, is referred to as "2 RP" and its related narrative report as "2 NRP."

Detectives Frizzell and Coon performed a protective sweep of the RV. The detectives entered, scanned, made a U-turn through the RV kitchen and living room, looked in the bathroom, and spent 1½-2 minutes in the bedroom. The detectives only looked in places that could hide a person, such as under a mattress and piles of clothing and in large closets and cabinets. The detectives were inside the RV for more than 1½ minutes but no more than a few minutes. Upon leaving the RV, Detective Coon saw an "AR[2] handle" outside of the RV on the porch. CP at 157.

Detective Coon applied for a search warrant that afternoon. His affidavit in support of the search warrant stated that after Mr. Petek's girlfriend was detained:

> Upon entry of the RV I observed several items of illegal narcotic contraband. On the counter I notice a spoon that appeared to have white crystals on it. I also noticed several small ziplock style dope baggys resting on a shelf inside the RV. As we cleared the master bedroom of the RV for persons or hazards I observed 2 smoking devices, with one resting next to a torch lighter on the bed and the other on a nightstand. I could clearly see that the smoking devices contained white crystal like [sic] substance and burnt residue. I was able to immediately identify the substances as Meth pipes that contained Methamphetamine. While walking out of the RV I noticed a Decal [sic] on the wall that referenced shooting criminals as well as several ammo cans. Upon exiting the residence I also observed what appear to be AR style rifle parts / grips.
>
> Based on the above facts and circumstances (items observed in plain view) and the fact that Chris is a convicted Felon, I believe Probable Cause exists to believe that Chris's [sic] is in Violation of Uniform Controlled Substances Act RCW 69.50.401 /69.50.412 as well as Violation of RCW 9.41.040. I am requesting that a search warrant be granted to search both Chris's RV residence and his vehicle's [sic] on scene.

---

2 Presumably "ArmaLite."

6

CP at 25-26. The warrant was granted.

The court denied Mr. Petek's suppression motion after concluding that the detectives had a reasonable belief, based on specific and articulable facts, that the RV harbored an individual posing a danger to law enforcement on the arrest scene. The court ruled that the initial entry into the RV was lawful under the protective sweep exception to the warrant requirement.

TRIAL

The State called as trial witnesses Detectives Frizzell, Schumacher, and Coon, as well as Stevens County Sheriff's Detective Sergeant Michael Gilmore, who had also participated in locating and arresting Mr. Petek. It also called a witness from the state crime lab.

Evidence established that on obtaining and executing the search warrant, the Stevens County officers recovered the drug paraphernalia seen in the initial sweep. They also discovered a digital scale. In the bedroom, officers found a bong smoking device, Mr. Petek's social security card, and male clothing. Underneath the bed, the officers discovered an AR-15 firearm, loaded with three rounds. The firearm was later tested to confirm it was operational.

Within the bedroom, law enforcement also discovered two containers: a zippered pouch and a plastic tote. Officers testified that the zippered pouch was recognizable as a

7

"drug kit," in which drug users commonly store drugs and paraphernalia. 2 RP at 205.
The pouch contained a large package of dope-style "baggies,"[3] a scale, and needles.

Law enforcement found three different substances inside the zippered pouch. A baggie weighing 1.3 grams contained a white powder that looked like cocaine.[4] Three baggies of brown, "hard balls of tar-like substance" looked like heroin and weighed 18.3 grams total. 2 NRP at 198. A baggie of a crystal substance that looked like methamphetamine weighed 60.6 grams.

The plastic tote contained another baggie of the "white substance" that also looked like methamphetamine, weighing 90.3 grams. 2 RP at 338. The tote also contained ammunition.

A clear container holding a "brown tar-like . . . substance" that looked like black tar heroin was on the table-dresser area adjacent to the bed in the bedroom. 2 RP at 296. This substance weighed 6.8 grams.

To determine what the substances were, most were only field tested. According to Detective Coon, because the Washington State Patrol (WSP) crime lab is backed up, it puts limits on what evidence and how much evidence it will test in a case. He testified

---

[3] "Dope-style" baggies, also known as bindles, are one-inch by one-inch "ziploc" bags.

[4] The report of proceedings suggests that the weight was testified to be "123" grams, 2 RP at 298, but based on the exhibit photographing the substance on a scale, the actual weight was 1.3 grams. Trial Ex. P-27.

that he did not think the crime lab would even test an item it knew had field tested

negative for a controlled substance.

The heroin-like substance found in the zippered pouch was field tested and

showed a false positive result. There was testimony that the "white substance in the

baggies" was field tested and showed no presumptive result, 2 RP at 308, but it is not

clear whether this was the "white powder" that looked like cocaine or the "crystal

substance" that looked like methamphetamine. None of the substances recovered from

the zippered pouch or tote were submitted to the WSP crime lab for further testing.

Detective Coon testified that field testing does not produce an "exact result," but

can be a presumptive test for what a substance may or may not be. 2 RP at 307. He was

asked first about testing the tar-like substance suspected of being heroin:

> Q     Okay. Now, in speaking of the—Exhibit No. 8 that you just had, the—what you suspected to be heroin, did you do a test on that?
>
> A     I did—
>
> . . . .
>
> Q     You got a result on that?
>
> A     I did.
>
> Q     Now, with these, are these—obviously—are they meant to be 100 percent accurate[?]
>
> A     No.
>
> Q     Okay. And, so, are they sometimes—I guess do they give false positives[?]
>
> A     They can.

Q      All right.  And—is that why you normally send these substances
       to—lab for final testing?

A      Yes.

Q      All right.  So you—received a result on that substance.  Did you
       come to know that that was a false positive?

A      I did.

Q      All right.  And you didn't—send that substance to the lab, then[?]

A      No.

2 RP at 307-08.

He was then asked about the crystal-like substance in the baggies:

Q      Now did you test the white substances in the baggies as well?

A      Yes.

Q      And did you get any type of presumptive result for those?

A      I did.

. . . .

Q      No result?

A      No.

2 RP at 308; *see also* 2 NRP at 308.  In later testimony, he clarified that the field testing

of the substance in the baggies did not yield a presumptive positive.

Detective Coon testified that after executing the search warrant, officers went to

the jail, where they interviewed Mr. Petek.  He asked Mr. Petek about the zippered pouch

and the substances found in the RV.

Mr. Petek told the officers at times during the interview that the gray pouch was

his, though later he said that he found it in the RV.  He also claimed that most of the

10

items in the pouch were not his and were instead just things he had found. Mr. Petek told

the officers that the tar-like substance in the baggie and clear container was "fake heroin"

and identified the crystal substance as MSM[5] or "fake meth." 2 RP at 327, 344. He

claimed that he found the "fake heroin" in the RV while he was cleaning, tasted it, and

then put it in the pouch. He similarly said that he found the "fake meth" and cocaine-like

substance in the RV.

Detective Coon described MSM as a "chemical substance that[,] when mixed

directly[,] closely resembles methamphetamine, often-times used to mix into a bag of

methamphetamine to increase its weight and resale." 2 RP at 326. Detective Frizzell

testified that MSM is a "cutting agent," meaning it is a substance used "to make a small

amount of—drugs, narcotics, less potent than a larger amount." 2 RP at 182.

Mr. Petek told detectives he was aware that the AR-15, that he said belonged to

Mr. Level, was in the RV. He admitted he may have handled or fired it in the past. He

also talked about shooting a firearm within the last few weeks with a neighbor.

Mr. Petek admitted to being a methamphetamine user but denied using heroin.

Asked if he sold methamphetamine, Mr. Petek admitted that he did, mainly to support his

own habit. He said he had sold drugs while he was staying in the RV.

For Mr. Petek's first degree unlawful possession of a firearm charge, the State was

required to prove that he had previously been convicted of delivery of a controlled

---

[5] Methylsulfonylmethane.

11

substance. Mr. Petek had refused to stipulate to the element, so the State offered a

certified judgment reflecting a conviction for a felony drug charge that "Christopher

Donald Petek" had received in 2013. The judgment and sentence listed the convicted Mr.

Petek's date of birth, Washington State identification number, and FBI[6] number.

After the State rested its case, the defense immediately rested. During a break

before closing argument, defense counsel moved the court outside the presence of the

jury to dismiss the unlawful possession of a firearm charge. Citing *State v. Ceja Santos*,

163 Wn. App. 780, 260 P.3d 982 (2011), defense counsel argued that the State failed to

produce sufficient evidence that the Christopher Petek convicted in the 2013 judgment

and sentence was the same Christopher Petek on trial in the present case.

To defense counsel's apparent surprise, the prosecutor asked for leave to reopen

its case to present evidence tying the present defendant to the 2013 judgment and

sentence. Defense counsel responded, "I do not believe you can reopen that after the

defense rests." 2 NRP at 412. Following a short recess, defense counsel conceded that

for the State to reopen was discretionary with the court. He asked the court to deny the

request, but the court granted it.

The State called as a witness a sergeant with the Stevens County Jail, who

presented evidence that the jail's booking information for the defendant on trial matched

---

[6] Federal Bureau of Investigation.

the identifying information for Christopher Petek in the 2013 judgment and sentence.

Detective Coon was also recalled, and testified that Mr. Petek told him when interviewed

that he had been previously convicted of a drug charge involving oxycodone.

The jury found Mr. Petek guilty as charged. He appeals.

ANALYSIS

Mr. Petek makes seven assignments of error, three of which prove dispositive. We

first review his challenges to findings of fact made in denying the suppression motion.

We then address his challenge to denial of that motion and to the sufficiency of the

evidence to support the imitation controlled substance counts.[7]

I.     CHALLENGED FINDINGS OF FACT

Mr. Petek assigns error to seven of the trial court's findings of fact made in

denying his suppression motion. One is a mislabeled conclusion of law. Findings of fact

made in ruling on a motion to suppress are reviewed under the substantial evidence

standard. *State v. Levy*, 156 Wn.2d 709, 733, 132 P.3d 1076 (2006). Evidence is

substantial where there is "evidence sufficient to persuade a fair-minded, rational person

---

[7] Mr. Petek's remaining assignments of error are that the information was constitutionally defective by omitting an essential element of unlawful possession of a firearm; defense counsel rendered ineffective assistance of counsel by moving to dismiss at a time when the State could reopen its case; and even if there is no corpus delicti violation, the evidence is still insufficient. The first two alleged errors, if error, may be avoided in any retrial. The third alleged error is rendered moot by our conclusion that corpus delicti was not established.

of the truth of the finding." *State v. Mendez*, 137 Wn.2d 208, 214, 970 P.2d 722 (1999).

We review the challenged findings in turn.

> *Finding of Fact (FF) 2: "Law enforcement was also aware that the ATF[8] had recently recovered ammunition during search of a prior residence where the Defendant had been staying."* CP at 155.

At the suppression hearing, the court heard testimony from Detective Coon that an ATF agent informed him of a first-hand search warrant executed at some time on the last trailer where Mr. Petek lived. The detective believed the ATF investigation was still ongoing. Officers testified that an ATF agent provided information that Mr. Petek likely possessed firearms. There was no other testimony about the ATF search or any items that were recovered. This finding is not supported by substantial evidence.

> *FF 2: "Detectives were aware . . . that he was on DOC supervision for convictions regarding drugs and firearm possession."* CP at 155.

Officers testified that the DOC warrant was issued "for escaping community custody and dangerous drugs." 1 RP at 41. No evidence was presented about the nature of the convictions leading to his supervision. Although the arresting officers had information to believe that Mr. Petek may be a felon in possession, there was no evidence presented that Mr. Petek was on supervision for a prior firearm conviction. This finding is not supported by substantial evidence.

---

[8] Bureau of Alcohol, Firearms, Tobacco and Explosives.

> *FF 5: "The RV was known to belong to Joseph Level, a convicted felon."*
> CP at 156.

Detective Coon testified that he knew the RV belonged to Mr. Level. He also testified that Mr. Petek told him that Mr. Level was *arrested* while in Oregon, but he had no information about the nature of the arrest or any prior criminal history. The finding that Mr. Level is a convicted felon is not supported by substantial evidence.

> *FF 4: "Law enforcement . . . could see movement inside the RV."* CP at 156.
> *FF 8: "However, law enforcement could still see movement . . . from inside the RV."* CP at 156.

FF 4 addresses what law enforcement saw during the time Mr. Petek was refusing to come out of the RV. Officers testified that during this period they could *hear* conversation and the sounds of furtive movements inside the RV. There was no testimony about *seeing* movement during this time. The testimony established that the RV door was closed, officers backed away to take cover, and the front door was partially obscured by Tyvek wrap. The only movement observed to which officers testified were Mr. Petek retreating into the RV on their arrival, and later emerging. The challenged portion of FF 4 is not supported by substantial evidence.

FF 8 addresses what law enforcement saw after Mr. Petek emerged from the RV and before his girlfriend opened the door and was removed. The evidence presented was that the door remained closed until she opened it, and there was no testimony that any movements were seen inside the RV in this time frame. Detective Schumacher and

Detective Coon testified only that they could still *hear* the sounds of movement inside the RV. It was not until Mr. Petek's girlfriend had opened the door and Detective Frizzell reached in to grab her that he saw a dog in the living room area. This portion of FF 8 is not supported by substantial evidence.

> FF 8: *"After being asked several times in rapid succession, the Defendant said his girlfriend was inside the RV, but refused to provide her name."* CP at 156.

Mr. Petek challenges the "refused to provide her name" portion of this finding. He argues that there was no evidence law enforcement ever asked him to identify his girlfriend.

The finding appears to be an inference from the testimony of several officers that Mr. Petek originally lied about no one else being in the RV, and the following additional testimony:

- From Detective Schumacher, who testified that Mr. Petek "d[id]n't want to identify" his girlfriend. 1 RP at 32.
- Detective Frizzell, after testifying that Mr. Petek finally admitted there was someone in the RV, was asked if he identified the person by name, answered, "I believe he said—her name—maybe just 'female.'" 1 RP at 44.
- After Detective Coon testified that Mr. Petek belatedly told him his girlfriend was in the RV, he was asked, "Does he tell you exactly who she is?" and answered, "No." 1 RP at 71.

There is enough testimony from which to infer that Mr. Petek did not provide his girlfriend's name, and even that he appeared *not to want to* provide her name. There was not substantial evidence supporting a finding that he "refused" to provide her name.

16

> *CL 3: "The arrest occurred in a confined setting of unknown configuration on the Defendant's turf."  CP at 157.*

Mr. Petek finally challenges the court's third conclusion of law, which he contends is a mislabeled finding of fact.  *Willener v. Sweeting*, 107 Wn.2d 388, 394, 730 P.2d 45 (1986) ("[A] finding of fact erroneously described as a conclusion of law is reviewed as a finding of fact.").

The expression "confined setting of unknown configuration on the defendant's turf" is derived from *Maryland v. Buie*, 494 U.S. 325, 327, 110 S. Ct. 1093, 108 L. Ed. 2d 276 (1990), which decided the level of justification required before police officers effecting an arrest of a suspect may conduct a warrantless protective sweep of the premises.  In *Buie*, officers had arrested the defendant at his home, after he emerged from the basement, and then conducted a protective search of the basement.  *Id.* at 328.  While articulating the required level of justification, the Court remanded to the Maryland Court of Appeals to apply the standard, rather than apply the standard itself.  *Id.* at 337.

In discussing why the risk of an arrest in a home is as great as, if not greater than an on-the-street or roadside encounter, the Court stated:

> [U]nlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's "turf."  An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings.

*Id.* at 333.

Mr. Petek was arrested "a few steps outside of the front door" of the RV. 1 RP at 10, *see also* 1 RP at 23-24 (Mr. Petek walked a "few yards" from the RV before being detained). Mr. Petek argues that the "[o]utside of the RV is not a confined setting nor is it of unknown configuration." Br. of Appellant at 24. The common definition of "confined" is something "limited to a particular location" or "very small"; "configuration" commonly means the "relative arrangement of parts or elements." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary(last visited Mar. 28, 2023).

To parrot *Buie*'s language as supportive is questionable where *Buie* was not describing an outdoor arrest, it was describing an indoor arrest and *contrasting* outdoor encounters as relatively safer. If the point of the finding was that officers had been at the scene for no more than 20 minutes and had no knowledge of the interior of the RV, that is supported by the evidence, and we will construe the finding in that manner.

II.     THE SWEEP CANNOT BE JUSTIFIED AS A CONSTITUTIONAL PROTECTIVE SWEEP

Warrantless searches are per se unreasonable under the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington State Constitution unless they fall within a clearly delineated exception. *State v. Ross*, 141 Wn.2d 304, 312, 4 P.3d 130 (2000); *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971). The Washington Supreme Court recognizes that "there are a few 'jealously and carefully drawn exceptions' to the warrant requirement which 'provide for

those cases where the societal costs of obtaining a warrant, such as danger to the law officers or the risk of loss or destruction of evidence, outweigh the reasons for prior recourse to a neutral magistrate.'" *State v. Houser*, 95 Wn.2d 143, 149, 622 P.2d 1218 (1980) (quoting *Arkansas v. Sanders*, 442 U.S. 753, 759, 99 S. Ct. 2586, 61 L. Ed. 2d 235 (1979) (internal quotation marks omitted)). The burden is on the prosecutor to show that a warrantless search or seizure falls within one of these closely guarded exceptions. *State v. Smith*, 165 Wn.2d 511, 517, 199 P.3d 386 (2009). Police may not use an exception as pretext for an evidentiary search. *Id.*

A "protective sweep" is "a quick limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others" and is "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Buie*, 494 U.S. at 327; *State v. Hopkins*, 113 Wn. App. 954, 959, 55 P.3d 691 (2002). The sweep should last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Buie*, 494 U.S. at 335-36.

The Supreme Court concluded in analyzing what level of justification should be required for a protective sweep that the principles it had applied in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), and *Michigan v. Long*, 463 U.S. 1032, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983), were most instructive. *Buie*, 494 U.S. at 331-32. In both cases, it had balanced the need to search against the invasion that the search

19

entails. *Id.* at 332. In *Terry*, it authorized a limited patdown for weapons "where a reasonably prudent officer would be warranted in the belief, based on 'specific and articulable facts,' and not on a mere 'inchoate and unparticularized suspicion or hunch,' that he is dealing with an armed and dangerous individual." *Id.* (citations omitted) (internal quotation marks omitted) (quoting *Terry*, 392 U.S. at 21, 27). In *Long*, it applied the principles of *Terry* in the context of a roadside encounter and held that a search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible "'if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officer in believing that the suspect is dangerous and may gain immediate control of weapons.'" *Id.* (quoting *Long*, 463 U.S. at 1049-50 (quoting *Terry*, 392 U.S. at 21)).

Applying the principles from those cases, the Court held in *Buie* that a protective sweep may be justified incident to the arrest of a suspect in his home, "as a precautionary matter and without probable cause or reasonable suspicion, [to] look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* at 334. This justification does not apply where, as here, the

arrest occurs outside the home. *State v. Chambers*, 197 Wn. App. 96, 125-26, 387 P.3d

1108 (2016).[9] It is not relied on in this case.

*Buie* held that "beyond that," a protective sweep "must be [based on] articulable

facts which, taken together with the rational inferences from those facts, would warrant a

reasonably prudent officer in believing that the area to be swept harbors an individual

posing a danger to those on the arrest scene." 494 U.S. at 334. There must be facts

establishing "more than a general suspicion of the possibility of danger." *Chambers*, 197

Wn. App. at 127; *see also State v. Sadler*, 147 Wn. App. 97, 126, 193 P.3d 1108 (2008)

("A general desire to make sure that there are no other individuals present is not

sufficient.").

In *Hopkins*, this court held that the protective sweep exception was not met where

the police searched a shed and trailer without a warrant. 113 Wn. App. at 956. Seven

sheriff's deputies who had traveled to a rural property to arrest the defendant on an

outstanding warrant saw two men standing near a shed. *Id.* One man said something to

other, entered the shed briefly, and then came back out; both men were quickly detained.

*Id.* Neither was the subject of the warrant. *Id.* After the subject of the warrant was

---

[9] Multiple other courts have held that a doorstep, front porch, doorway, or threshold arrest is considered an "arrest outside the home" for the purposes of the *Buie* analysis. *See United States v. Archibald*, 589 F.3d 289, 297 (6th Cir. 2009) (citing multiple cases with similar entryway arrests); *United State v. Henry*, 48 F.3d 1282, 1284 (D.C. Cir. 1995) (same).

arrested at a nearby trailer, the deputies entered the shed "'just to do a security check to make sure there were no other individuals inside.'" *Id.*

The officers later testified that people on methamphetamine are known to be aggressive and so they searched the shed to look for such people. *Id.* The officers also searched the trailer, believing that "[t]here are people that go to the residence at different times. There is a lot of people and sometimes there is not a lot of people, it just depends what time of day it is." *Id.* at 957. This court held that it was not a valid protective sweep, since "the State presented no facts that would have led [the officers] reasonably to believe both that other persons actually were present and that those persons were methamphetamine users." *Id.* at 960.

Federal courts have aptly held that lacking information that the environs is safe "cannot be an articulable basis for a sweep that requires information to justify it in the first place." *United States v. Colbert*, 76 F.3d 773, 778 (6th Cir. 1996). "[L]ack of knowledge cannot constitute the specific, articulable facts required by *Buie*." *United States v. Bagley*, 877 F.3d 1151, 1156 (10th Cir. 2017) (citing *United States v. Nelson*, 868 F.3d 885, 889 (10th Cir. 2017)).

The State points to Mr. Petek's dishonesty about who was inside the RV as justifying the sweep. This alone does not give rise to any reasonable belief that another person was in the trailer beyond Mr. Petek's girlfriend, nor any belief that someone inside would be dangerous.

22

The State relies on Detective Frizzell's testimony that he held concerns about safety based on the RV itself and the idea that "somebody could easily shoot blindly through the wall and injure or kill all of us." 1 RP at 43; *see also* 1 RP at 12 (Detective Schumacher: "So there's (inaudible) for any door (inaudible) you don't want to be in front of it or near it when it's opened like that just because that's where any threats could be directly coming from."). The court also found that the officers had no safe place to take cover as they waited outside the RV. The perceived vulnerability of an officer is not a justification absent articulated facts establishing the danger posed by another person, however. *See Archibald*, 589 F.3d at 299 (noting the "fatal funnel" of a doorway to a residence did not demonstrate "a specific and reasonable belief" that another person was in the residence and posed a danger); *United States v. Ford*, 56 F.3d 265, 269 n.6 (D.C. Cir. 1995) (noting the "poor lighting conditions in the apartment" had nothing to do with the belief that the area harbored another dangerous individual).

The State principally relies on sounds of movement that continued after Mr. Petek and his girlfriend were both detained outside the RV. But no officer articulated facts on the basis of which they reasonably believed the sounds were being made by a person. *See* 1 NRP at 29 ("[W]e could not articulate whether [the movement] was coming from dogs or people."); 1 RP at 34 ("[T]here were noises coming from inside very clearly, and we can't say if it's dogs or human, or what it is."); 1 RP at 92 ("Not for a fact [did they indicate that was a person], no. But suspected, yes."); 1 RP at 12 ("we're always trained

23

that where there's one there's two, where there's two, there's three, and so on"). Officers

admitted that Mr. Petek had mentioned that there were "dogs" in the RV, and they had

seen one in the living area. The officers did not articulate facts from which to conclude

there was a person in the RV, let alone that it was a dangerous person.[10]

The State did not present articulable facts which, taken together with rational

inferences, would warrant a reasonably prudent officer in believing that the RV harbored

an individual posing a danger to those on the arrest scene. The motion to suppress should

have been granted.

"The exclusionary rule mandates the suppression of evidence gathered through

unconstitutional means." *State v. Duncan*, 146 Wn.2d 166, 176, 43 P.3d 513 (2002).

This includes evidence obtained as a direct or indirect result of the initial illegality. *State*

*v. Mayfield*, 192 Wn.2d 871, 888-89, 434 P.3d 58 (2019). Mr. Petek makes a reasoned

---

[10] For the first time on appeal, the State asks us to consider the lawfulness of the sweep based on an exigent circumstance: that Mr. Petek might have left an accessible firearm in the RV that could be shot through the RV's walls if there was someone inside. Mr. Petek points out that this is a new theory on appeal, and he asks that we decline to entertain it.

While an appellate court may affirm a suppression ruling on any ground the record supports, it is critical that the parties developed "both facts and legal argument supporting its position." *State v. Smith*, 165 Wn. App. 296, 308, 266 P.3d 250 (2011), *aff'd on other grounds*, 177 Wn.2d 533, 303 P.3d 1047 (2013). Where the State offers no supporting facts or argument at the suppression hearing to limit the application of the exclusionary rule, the Washington Supreme Court has discouraged appellate courts from ruling on new grounds on appeal. *See State v. Samalia*, 186 Wn.2d 262, 279, 375 P.3d 1082 (2016); *State v. Ibarra-Cisneros*, 172 Wn.2d 880, 885, 263 P.3d 591 (2011). Mr. Petek had no reason to defend against application of the exigent circumstances doctrine in the trial court, and we decline to consider it.

argument that the fruits of the illegal sweep include his statements when interviewed and evidence seized on executing the search warrant, but this issue was not reached by the trial court and the State does not address it. On remand, the State can assess whether it has enough untainted evidence to prosecute the remaining charge and the parties can present any dispute over the extent of tainted evidence to the trial court.

The remedy is to reverse the trial court's order denying the suppression motion, reverse Mr. Petek's convictions, and remand for a new trial at which the fruits of the illegal protective sweep of the RV shall be excluded.

III.     APPLYING THE CORPUS DELICTI DOCTRINE, THE EVIDENCE IS INSUFFICIENT TO
         SUPPORT THE CONVICTIONS FOR POSSESSION WITH THE INTENT TO DELIVER AN
         IMITATION CONTROLLED SUBSTANCE

RCW 69.52.030(1) makes it a class C felony to "manufacture, distribute, or possess with intent to distribute, an imitation controlled substance." "Imitation controlled substance" is defined to mean "a substance that is not a controlled substance, but which by appearance or representation would lead a reasonable person to believe that the substance is a controlled substance." RCW 69.52.020(3).

Mr. Petek contends the State did not present sufficient evidence independent of his confession to establish that the substances alleged to be in his possession were imitation controlled substances, and under the corpus delicti rule, the convictions must be reversed.

"The doctrine of corpus delicti protects against convictions based on false confessions, requiring evidence of the 'body of the crime.'" *State v. Cardenas-Flores*,

25

189 Wn.2d 243, 247, 401 P.3d 19 (2017) (internal quotation marks omitted) (quoting

*State v. Aten*, 130 Wn.2d 640, 655, 927 P.2d 210 (1996)). Under the corpus delicti rule, a

defendant's confession alone is insufficient to convict and must be corroborated by

independent evidence of guilt. *State v. Brockob*, 159 Wn.2d 311, 327-28, 150 P.3d 59

(2006) ("[T]he State must present evidence independent of the incriminating statement

that the crime a defendant *described in the* [*confession*] actually occurred."); *Aten*, 130

Wn.2d at 655-56("[I]f no such evidence exists, the defendant's confession . . . cannot be

used to establish the corpus delicti and prove the defendant's guilt at trial." (Emphasis

omitted)). Although Mr. Petek did not raise a corpus delicti challenge in the trial court,

"a criminal defendant may raise corpus delicti for the first time on appeal as a sufficiency

of the evidence challenge." *Cardenas-Flores*, 189 Wn.2d at 247.

"The corpus delicti can be proved by either direct or circumstantial evidence."

*Aten*, 130 Wn.2d at 655. "'It is sufficient if [the independent evidence] prima facie

establishes the corpus delicti.'" *Id.* at 656 (emphasis omitted) (quoting *State v. Meyer*,

37 Wn.2d 759, 764, 226 P.2d 204 (1951)). "'Prima facie' in this context means there is

'evidence of sufficient circumstances which would support a logical and reasonable

inference' of the facts sought to be proved." *Id.* (emphasis omitted). The evidence need

not be evidence sufficient to support a conviction or even send the case to the jury. *Id.*

The corroborating evidence "'must be consistent with guilt and inconsistent with a[ ]

26

hypothesis of innocence.'"  *Brockob*, 159 Wn.2d at 329 (alteration in original) (internal

quotation marks omitted) (quoting *Aten*, 130 Wn.2d at 660).

CORPUS DELICTI

Addressing the corpus delicti, the State focuses on what it argues is a low "prima

facie" standard when corpus delicti is at issue.  The Washington Supreme Court recently

credited a State argument that a "minimal" prima facie standard applies to corpus delicti,

and affirmed that its cases "limit the [corpus delicti] prima facie standard to that

'context.'"  *State v. Arbogast*, 199 Wn.2d 356, 373-74, 506 P.3d 1238 (2022) (citing

*Aten*, 130 Wn.2d at 656 (citing *State v. Vangerpen*, 125 Wn.2d 782, 796, 888 P.2d 1177

(1995) (citing *City of Bremerton v. Corbett*, 106 Wn.2d 569, 578, 723 P.2d 1135

(1986)))); *State v. Smith*, 115 Wn.2d 775, 781, 801 P.2d 975 (1990); *State v. McConville*,

122 Wn. App. 640, 650, 94 P.3d 401 (2004).  *Aten* observes, quoting the oft-cited

statement of the corpus delicti rule in *Meyer*, that "[t]he independent evidence need not

be of such a character as would establish the corpus delicti beyond a reasonable doubt, or

even by a preponderance of the proof.'"  130 Wn.2d at 656 (quoting *Meyer*, 37 Wn.2d at

763).  The State argues that its evidence of the field testing of the substances was enough

to meet this minimal prima facie standard and also satisfied the requirement for evidence

consistent with guilt and inconsistent with a hypothesis of innocence.

It may well be that a foundation could be laid for a forensic witness or officer with

appropriate training to testify that field testing produced a result satisfying these corpus

delicti tests.[11]  That is not the case here, however.  Detective Coon was the only witness to testify about the field testing and no foundation was laid to establish his knowledge of the testing's accuracy.  He only vaguely testified that the testing does not produce an "exact result"; if it yields no result, he would "not usually" send the substance to the lab, "[d]epending on what it is"; he *did* "[get] a result" on the suspected heroin but he "[came] to know that . . . was a false positive"; he tested the white substance and got a presumptive result; asked if it was "No result?" he answered, "No"; and he never sent the suspected imitation drugs to the state crime lab for testing.  2 RP at 307-08.  He never testified to how he came to learn that the "false positive" for the suspected heroin was "false."

The testimony about the field testing was vague because the prosecutor relied on Mr. Petek's admission that the substances were "fake."  In closing argument, she did not

---

[11] In the few decisions reviewing convictions under RCW 69.52.030(1) of which we are aware, crime lab testing was relied on to establish that the substances at issue were not controlled substances.  For example, in *State v. Young*, the State charged the defendant under RCW 69.52.030(1) after lab tests "concluded that the substance . . . was not a controlled substance, but rather was made from powdered Vitamin B."  86 Wn. App. 194, 198 n.1, 935 P.2d 1372 (1997), *aff'd*, 135 Wn.2d 498, 957 P.2d 681 (1998); *see also State v. Heidt*, No. 33424-4-III, slip op. at 3 (Wash. Ct. App. Sept. 20, 2016) (unpublished), https://www.courts.wa.gov/opinions/pdf/334244 _unp.pdf (crime lab testing proved the tampered bottle contained oxycodone and trace amounts of limonene, a compound found in popsicles); *State v. Wisenbaugh*, noted at 166 Wn. App. 1014, 2012 WL 298206, at *1-2 (crime lab testing proved that a white powdery substance that the defendant identified as MSM was in fact MSM).

argue that the field testing is what proved the substances were imitation; she relied on Mr.

Petek's admissions:

> Det[ective] Coon had no presumptive test . . . but they also had a
> confession—from Mr. Petek that it—the clear substance, the white
> substance, the white crystal substance was—cut or MSM, and you had a[n]
> admission from Mr. Petek that—the—black tar-like substance was fake
> heroin. Those were his words, "fake heroin." There is no reason to send
> that to the lab to be tested. It's not a real controlled substance. It's an
> imitation controlled substance. And a very good one at that.
>
> When you're looking—There's the instruction on how do you
> determine if the substance is in fact an imitation controlled substance. It's
> one that is not [a] controlled substance, by which—which by appearance or
> representation would lead a reasonable person to believe the substance is a
> controlled substance. And if you just look at the coloring, the structure,
> —all of those factors that go in with the heroin in—in the—fake heroin and
> the imitation methamphetamine, that itself would lead someone to believe
> —You also have the admissions that Mr. Petek knew in fact that it was cut
> or MSM and that it was fake heroin.

2 RP at 469-70. In rebuttal argument, the prosecutor again did not talk about the field

testing. She reminded jurors that Detective Coon testified that "it was [Mr. Petek's]

words that it was fake heroin," and "[Mr. Petek] is the only person that called it fake

heroin. He's the one that called it cut or MSM." 2 RP at 493-94.

The independent evidence on the imitation controlled substance charges was not

sufficient to establish the corpus delicti, so Mr. Petek's incriminating statements on that

score were improperly admitted. The question remains whether there was sufficient

evidence, absent his incriminating statements, to support his conviction. *State v.*

*Sprague*, 16 Wn. App. 2d 213, 232, 480 P.3d 471 (2021).

SUFFICIENCY OF THE EVIDENCE

Evidence is sufficient to support a guilty verdict if any rational trier of fact, viewing the evidence in the light most favorable to the State, could find the elements of the charged crime beyond a reasonable doubt. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). A claim of insufficiency admits the truth of all the State's evidence and all inferences that may be reasonably drawn from the evidence. *Id.* The appellate court defers to the trier of fact on issues of "conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004), *aff'd*, 166 Wn.2d 380, 208 P.3d 1107 (2009); *Cardenas-Flores*, 189 Wn.2d at 266.

Here, we are not dealing with a minimal prima facie standard, we are dealing with the State's burden of proving the essential elements of a crime beyond a reasonable doubt. While complete chemical analysis via lab testing is not always required to uphold a conviction based on the identity of a substance, in the absence of lab testing, Washington courts have emphasized that the lay testimony or circumstantial evidence must provide enough indicia of reliability to uphold the conviction. *State v. Colquitt*, 133 Wn. App. 789, 796-800, 137 P.3d 892 (2006); *see State v. Hernandez*, 85 Wn. App. 672, 675, 935 P.2d 623 (1997) (circumstantial evidence and lay testimony may be sufficient to establish the identity of a drug in a criminal case); *In re Pers. Restraint of Delmarter*, 124 Wn. App. 154, 163-64, 101 P.3d 111 (2004) (An independent field test and confession

could support a conviction for possession of a controlled substance after lab tests were excluded due to the misconduct of a state chemist.). For reasons already discussed, even viewed in the light most favorable to the State, the evidence of field testing in the trial below was too lacking in foundation and too vague to be reliable evidence that the substances, which appeared to be controlled substances, were imitation.

The State argues that the evidence was sufficient because Detective Coon testified that the dope-style baggies and scales were evidence that Mr. Petek intended to deliver the white powder that the detective identified as MSM, passing it off as methamphetamine. Resp't's Br. at 60-64. This begs the question of what evidence established that the powder was MSM. The State's response cites to 2 RP at 326, and specifically to the testimony highlighted in the following exchange:

Q     . . . [D]id you talk [to Mr. Petek] specifically about that substance that ended up not being sent to the lab, not testing presumptively positive for anything? Did you ask him about that substance[?]

A     I did.

Q     And,—you described them as the crystal shards?

A     Yes.

Q     And that's the exhibits that we had previously talked about as—Exhibits No. 9 and No. 3?

A     Yes.

Q     Okay. And, what did he tell you about this item[?]

A     He identified 'em as MSM or (inaudible).

Q     What is—do you know what MSM is?

A     I do.

Q     What is it[?]

A     *It's a powder chemical substance that*[,] *when mixed directly*[,] *closely resembles methamphetamine, often-times used to mix into a bag of methamphetamine to increase its weight and resale.*

2 RP at 325; 2 NRP at 326 (emphasis added).

Lacking independent evidence that the substance found in Mr. Petek's possession *was* MSM, the fact that the detective knew that MSM closely resembled methamphetamine and was often-times used to cut it was insufficient to prove an essential element: that "on or about December 30, 2020 the defendant possessed imitation methamphetamine." 2 RP at 454. Without Mr. Petek's admissions, evidence of the imitation controlled substance charges was insufficient.

## STATEMENT OF ADDITIONAL GROUNDS

In a pro se statement of additional grounds (SAG), Mr. Petek raises 14. While many if not all are moot in light of our disposition of the appeal, we address them, recognizing that Mr. Petek might believe they entitle him to further relief.

In review of a SAG, we will not consider a defendant's additional grounds if it does not inform the court of the nature and occurrence of alleged errors. RAP 10.10(c); *State v. Bluehorse*, 159 Wn. App. 410, 436, 248 P.3d 537 (2011). An appellate court is not required to search the record in support of claims made in the SAG. RAP 10.10(c). Error that was not raised in the trial court is generally unpreserved for appeal. RAP 2.5(a).

32

*SAG 1: Structural Error*

Mr. Petek contends structural error occurred when the trial court granted the State's motion to reopen its case. He cites no authority to support this proposition, and the relevant case that he cites, *State v. Killian*, holds otherwise. *State v. Killian*, No. 52656-5-II, slip op. at 7 (Wash. Ct. App. Jan. 22, 2020) (unpublished)[12] ("A motion to reopen a case to present further evidence is a matter within the discretion of the trial court.").

*SAG 2: Offender Score Error*

Mr. Petek contends his offender score was incorrectly calculated as 11 and should have been 3. He makes only vague references to issues of prior convictions washing out, constituting the same criminal conduct, or not being proved by the State. This is inadequate identification of the nature and occurrence of alleged errors. RAP 10.10(c). Review of Mr. Petek's criminal history does not reveal any "wash outs" that would have reduced his offender score from an 11.

*SAG 3: Evidentiary Error—"Chain of Custody" Violation*

Directing us to a sheriff's office "Evidence Inventory/Search Warrant Return" attached to his SAG, Mr. Petek contends that the "chain of custody" was violated because "the officers [sic] copy that I was given in county jail . . . is not signed by a judge or

---

[12] https://www.courts.wa.gov/opinions/pdf/D2%2052656-5-II%20Unpublished%20Opinion.pdf.

33

property officer." The same document appearing in the record is not lacking signatures, however. CP at 36-37. *See* RAP 10.10(c) ("[o]nly documents that are contained in the record on review should be attached or referred to in the statement" (emphasis omitted)).

*SAG 4: Fingerprint Evidence*

Mr. Petek notes that there was no fingerprint evidence presented in his case. The State was not required to produce such evidence to secure a conviction under RCW 9.41.040(1).

*SAG 5 & 6: Arrest Outside Home*

Mr. Petek discusses the circumstances of his arrest, but fails to identify any error for this court to review. RAP 10.10(c).

*SAG 7: Blocked from Being Co-counsel/Pro Se*

Mr. Petek contends he was blocked from serving as co-counsel in his defense. The occurrence of the alleged error is not identified. RAP 10.10(c).

*SAG 8: Blocked from Accessing Law Library in Jail*

Mr. Petek claims that he was blocked from accessing the law library in the jail. We see no evidence this was raised in the trial court. RAP 2.5(a).

*SAG 9: Habeas Corpus Motions*

Mr. Petek claims that numerous habeas corpus motions were "never heard and blocked by the county clerk and never made it in front of a judge." This assigned error is not identified in the record and cannot be reviewed. RAP 10.10(c).

34

*SAG 10: Two Judges*

Mr. Petek indicates that he had two judges overseeing his criminal proceedings. Because he does not inform the court of the nature or occurrence of alleged error, this will not be considered. RAP 10.10(c).

*SAG 11: Jury*

Mr. Petek contends that several jurors knew the prosecuting attorney, but fails to state the nature of the alleged error. RAP 10.10(c).

*SAG 12: Possession of Imitation Controlled Substance—Unranked Felony*

Mr. Petek identifies that RCW 69.52.030(1) is an unranked felony under RCW 9.94A.515. Without the support of authority, he argues that his conviction should have been a "gross misdemeanor." A conviction under RCW 69.52.030(1) is considered a drug offense serious level II. RCW 9.94A.518. RCW 69.52.030(1) provides that "[a]ny person who violates this subsection shall, upon conviction, be guilty of a class C felony."

*SAG 13: Convicted of Nonexistent Crime*

Mr. Petek argues that the purpose of RCW 69.52.030(1) is "to combat imitation prescription medications," not "imitation meth or imitation heroin." SAG at 2. No legal authority or reasoned argument is provided in support. Washington courts have previously upheld convictions under this statute for imitation methamphetamine. *See State v. Wisenbaugh*, noted at 166 Wn. App. 1014, 2012 WL 298206.

No. 38278-8-III
*State v. Petek*

*SAG 14: Errors in Judgment and Sentence*

Mr. Petek claims there are errors in accounting for dates and counties in his judgment and sentence. Since he fails to identify the nature or occurrence of any error, review is not warranted. RAP 10.10(c).

We reverse the trial court's order denying Mr. Petek's suppression motion, reverse his convictions, and direct the trial court to dismiss with prejudice the charges for possession of an imitation controlled substance with intent to deliver. We order a new trial of the first degree possession of a firearm charge at which the fruits of the illegal protective sweep must be excluded.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, C.J.

WE CONCUR:

Fearing, J.

Pennell, J.

36